# In the United States Court of Appeals for the Fifth Circuit

La Union del Pueblo Entero; Friendship-West Baptist Church; Anti-Defamation League Austin, Southwest, and Texoma; Southwest Voter Registration Education Project; Texas Impact; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; JOLT Action; William C. Velazquez Institute; James Lewin; Fiel Houston, Incorporated,

*Plaintiffs-Appellees,*

*v.*

Jane Nelson, In Her Official Capacity as Texas Secretary of State; Ken Paxton, In His Official Capacity as Attorney General of Texas; State of Texas,

*Defendants-Appellants,*

consolidated with
No. 22-50777

Mi Familia Vota; Marla Lopez; Marlon Lopez; Paul Rutledge,

*Plaintiffs-Appellees,*

*v.*

Gregory W. Abbott, In His Official Capacity as Governor of Texas; Jane Nelson, In Her Official Capacity as Secretary of State of Texas; Ken Paxton, In His Official Capacity as Attorney General of Texas,

*Defendants-Appellants,*

Delta Sigma Theta Sorority, Incorporated; Houston
Area Urban League, The Arc of Texas; Jeffrey Lamar
Clemmons,

*Plaintiffs-Appellees,*

*v.*

Gregory Wayne Abbott, In His Official Capacity as the
Governor of Texas, Ken Paxton, In His Official Capacity
as the Attorney General of Texas,

*Defendants-Appellants,*

Mi Familia Vota; Marla Lopez; Marlon Lopez; Paul
Rutledge,

*Plaintiffs-Appellees,*

*v.*

Greg Abbott, In His Official Capacity as Governor of
Texas; Jane Nelson, In Her Official Capacity as Texas
Secretary of State; Ken Paxton, In His Official Capacity
as Attorney General of Texas,

*Defendants-Appellants,*

consolidated with
No. 22-50778

La Union Del Pueblo Entero; Et al,

*Plaintiffs,*

*v.*

Gregory W. Abbott, In His Official Capacity as Governor
of Texas; Et al,

*Defendants,*

OCA-GREATER HOUSTON; LEAGUE OF WOMEN VOTERS OF TEXAS; REVUP-TEXAS,

*Plaintiffs-Appellees,*

*v.*

JANE NELSON, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE; KEN PAXTON, ATTORNEY GENERAL, STATE OF TEXAS

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

## APPELLANTS' PETITION
## FOR REHEARING EN BANC

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

WILLIAM R. PETERSON
Solicitor General

WILLIAM F. COLE
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

*Counsel for Defendants-Appellants*

# Certificate of Interested Persons

No. 22-50775, *La Union del Pueblo Entero v. Nelson*
*Consolidated with* Nos. 22-50777 and 22-50778

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Defendants-Appellants, as governmental parties, need not furnish a certificate of interested persons.

/s/ William F. Cole
William F. Cole
*Counsel of Record for*
*Defendants-Appellants*

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................. i

Table of Authorities .............................................................................. iii

Introduction and Rule 40(b) Statement.................................................1

Issue Meriting En Banc Consideration ..................................................3

Statement of the Case ............................................................................3

Argument.............................................................................................. 6

    I.    The Court Should Resolve Longstanding Confusion in its Precedent Over the Scope of the *Young* Exception to State Sovereign Immunity.... 6

    II.    This Appeal is an Ideal Vehicle for Resolving this Issue Because the Panel's Decision Conflicts with *Young* and this Court's Precedent.......10

Conclusion............................................................................................ 15

Certificate of Compliance .................................................................... 16

# Table of Authorities

Page(s)

**Cases:**

*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*,
   851 F.3d 507 (5th Cir. 2017) ............................................................. 1, 8

*Alden v. Maine*,
   527 U.S. 706 (1999) ........................................................................... 6

*Book People, Inc. v. Wong*,
   91 F.4th 318 (5th Cir. 2024) ............................................................ 2, 9

*City of Austin v. Paxton*,
   943 F.3d 993 (5th Cir. 2019) ...............................................1, 6, 7, 8, 9

*Ex parte Young*,
   209 U.S. 123 (1908) ..................................................................... 1, 10

*Fitts v. McGhee*,
   172 U.S. 516 (1899) .......................................................................... 8

*Green Valley Special Util. Dist. v. City of Schertz*,
   969 F.3d 460 (5th Cir. 2020) (en banc) ............................................... 7

*Haverkamp v. Linthicum*,
   6 F.4th 662 (5th Cir. 2021) .............................................................. 6, 7

*Healthy Vision Ass'n v. Abbott*,
   138 F.4th 385 (5th Cir. 2025) ............................................................ 9

*In re Abbott*,
   956 F.3d 696 (5th Cir. 2020) ........................................................... 12

*Jackson v. Wright*,
   82 F.4th 362 (5th Cir. 2023) .............................................................. 9

*K.P. v. LeBlanc*,
   627 F.3d 115 (5th Cir. 2010) .......................................................1, 7, 8

*La Union del Pueblo Entero v. Nelson*,
   163 F.4th 239 (5th Cir. 2025) .................2, 3, 4, 5, 6, 10, 11, 12, 13, 14

*Mi Familia Vota v. Abbott*,
   977 F.3d 461 (5th Cir. 2020) ........................................................ 12, 14

*Mi Familia Vota v. Ogg*,
   105 F.4th 313 (5th Cir. 2024) ............................................................ 9

iii

*Morris v. Livingston*,
739 F.3d 740 (5th Cir. 2014) ........................................................... 1, 8

*Okpalobi v. Foster*,
244 F.3d 405 (5th Cir. 2001) (en banc) ..................................... 1, 8, 9

*Nat'l Press Photographers Ass'n v. McCraw*,
90 F.4th 770 (5th Cir. 2024) ............................................................ 9

*Raj v. La. State Univ.*,
714 F.3d 322 (5th Cir. 2013) ............................................................7

*Richardson v. Flores*,
28 F.4th 649 (5th Cir. 2022) .....................................................13, 14

*Russell v. Jones*,
49 F.4th 507 (5th Cir. 2022) ............................................................ 6

*Tex. All. for Retired Ams. v. Scott*,
28 F.4th 669 (5th Cir.2022) .......................................... 2, 7, 8, 9, 13

*Tex. Democratic Party v. Abbott*,
961 F.3d 389 (5th Cir. 2020) ...........................................................1

*Tex. Democratic Party v. Abbott*,
978 F.3d 168 (5th Cir. 2020) ......................................... 2, 7, 9, 12, 13

*Tex. Democratic Party v. Hughs*,
860 F. App'x 874 (5th Cir. 2021) ............................................. 7-8, 9, 12

*Tex. Democratic Party v. Hughs*,
997 F.3d 288 (5th Cir. 2021)...................................................... 1, 2, 8

*United States v. Abbott*,
85 F.4th 328 (5th Cir. 2023) ....................................................... 9, 12

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
535 U.S. 635 (2002) ........................................................................7

*Whole Woman's Health v. Jackson*,
595 U.S. 30 (2021) ....................................................................... 14

**Statutes and Rules:**

42 U.S.C. § 1983 ................................................................................3

Tex. Elec. Code:

§ 1.0015 ...........................................................................................3

§ 84.001 ......................................................................................... 13

§ 84.002 .................................................................................. 13

§ 84.011 .................................................................................. 13

§ 86.001 .................................................................................. 14

Fed. R. App. P. 40 ........................................................... 2, 9, 10

## Other Authorities:

Jonathan F. Mitchell, *The Writ of Erasure Fallacy*, 104 Va. L. Rev. 933 (2018) ...... 14

Texas Election Integrity Act of 2021, Act of Aug. 31, 2021, 87th Leg.,
2d C.S., ch. 1, 2021 Tex. Sess. Law Serv. 3873 .................................................. 3

# Introduction and Rule 40(B) Statement

The *Ex parte Young* exception to state sovereign immunity allows "private parties [to] bring suits for injunctive or declaratory relief against individual state officials acting in violation of federal law." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (citation omitted). "For the exception to apply, the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act.'" *Id.* (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

But this Court has "not outlined a clear test for when a state official is sufficiently connected to the enforcement of a state law so as to be a proper defendant under *Ex parte Young*." *Tex. Democratic Party v. Hughs*, 997 F.3d 288, 291 & n.12 (5th Cir. 2021) ("*TDP IV*"). As many members of this Court have lamented, "[o]ur decisions are not a model of clarity on what 'constitutes a sufficient connection to enforcement.'" *E.g.*, *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400 n.21 (5th Cir. 2020) ("*TDP I*") (quoting *City of Austin*, 943 F.3d at 999).

Twenty-five years ago, a plurality of a fractured en banc Court announced that a state official must be "specially charged with the duty to enforce the statute" in order for a plaintiff to satisfy *Ex parte Young*. *Okpalobi v. Foster*, 244 F.3d 405, 414 (5th Cir. 2001) (en banc) (plurality op.). In the intervening years, some panels have applied that standard, *see Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014), others have eschewed it as nonbinding dicta, *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010), and still others have not taken a position. *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 518 (5th Cir. 2017). And while lately

some panels have attempted to distill from these precedents three "guideposts" that require a more rigorous showing, *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir.2022) ("*TARA*"), other panels appear to reduce the inquiry to the question whether the state-official defendant has a mere "scintilla of 'enforcement'" authority, *see, e.g.*, *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) ("*TDP II*"); *Book People, Inc. v. Wong*, 91 F.4th 318, 335 (5th Cir. 2024). This lack of clarity results in "precedent [that] is beset by entropy," and which "generates ever-more-chaotic-and-inconsistent decisions about how much enforcement authority is enough." *La Union del Pueblo Entero v. Nelson*, 163 F.4th 239, 283 (5th Cir. 2025) ("*LUPE*") (Oldham, J., concurring in part and dissenting in part).

The panel's decision in this appeal contributes to this confusion by holding that plaintiffs may rely on the *Ex parte Young* exception even if the state-official defendants cannot enforce the challenged law against the plaintiffs but only against third parties not before the Court. Thus, the panel permitted Plaintiffs' constitutional claims to go forward against the Texas Secretary of State and Attorney General with respect to more than a dozen election laws, even though those officials can enforce the challenged provisions of law, if at all, only against county-level election officials, none of whom are plaintiffs here. Because that rule is inconsistent with *Ex parte Young* itself and this Court's own precedent, *id.* at 278-79, the Court should grant this petition to secure the uniformity of its precedent in this area where "[a]pplying our precedents . . . is no easy task," *TDP IV*, 997 F.3d at 291. *See* Fed. R. App. P. 40(b)(2)(A), (B).

## Issue Meriting En Banc Consideration

Whether a plaintiff may rely on the *Ex parte Young* exception to state sovereign immunity when the state-official defendant cannot enforce the challenged provisions against the plaintiff but only against third parties not before the Court.

## Statement of the Case

In 2021, following various procedural irregularities associated with the 2020 election, the 87th Texas Legislature enacted the Texas Election Integrity Act ("S.B.1"). S.B.1 was designed to ensure that "application of th[e] [Texas Election] [C]ode and the conduct of elections be uniform and consistent throughout this state to reduce the likelihood of fraud in the conduct of elections, protect the secrecy of the ballot, promote voter access, and ensure that all legally cast ballots are counted." Act of Aug. 31, 2021, 87th Leg., 2d C.S., ch. 1, art. I, § 1.04 (codified at Tex. Elec. Code § 1.0015). To this end, S.B.1 amended several provisions of the Texas Election Code, including provisions governing voter registration, *id.* art. II, the conduct and security of elections, *id.* art. III, election officers and observers, *id.* art. IV, voting by mail, *id.* art. V, voter assistance, *id.* art. VI, and unlawful conduct, *id.* art. VII. *See LUPE*, 163 F.4th at 249-52 (describing each provision of S.B.1).

Immediately upon S.B.1's passage, the State was besieged by a slew of lawsuits challenging S.B.1's legality on a variety of constitutional and statutory grounds, including First and Fourteenth Amendment claims brought under 42 U.S.C. § 1983. *Id.* at 248-49. Relevant here, three groups of plaintiffs comprising twenty-five organizations and individuals sued the Secretary of State and the Attorney General

3

"challeng[ing] thirty-eight provisions of S.B.1." *Id.* at 249. The Secretary and Attorney General filed motions to dismiss, asserting sovereign immunity from these claims. *Id.* at 252. The district court rejected their sovereign immunity arguments and denied in relevant part the motions to dismiss, holding that the Secretary has a sufficient enforcement connection to thirty-seven challenged provisions of S.B.1, *id.* at 258 & n.118, and that the Attorney General has a sufficient enforcement connection to twenty-nine provisions, *id.* at 270 & n.234.

The Secretary and Attorney General noticed interlocutory appeals from the district court's three orders, which were consolidated before this Court. A divided panel affirmed in part and reversed in part. The majority held that the Secretary has a sufficient enforcement connection to:

- three provisions of S.B.1 concerning the maintenance of voter-registration lists because one of those provisions authorizes the Secretary to sanction voter registrars who fail to comply with the Election Code's requirements; and

- eleven provisions of S.B.1 governing the process of early voting, mail-in voting, voter-assistance, and delivery of ballots because the Secretary designs the forms local election officials use to facilitate those processes.

*Id.* at 258-62. The majority also held that the Secretary *lacked* the requisite enforcement connection to:

- eleven provisions of S.B.1 describing criminal or civil offenses under the Election Code because the Secretary's authority to refer violations of those

provisions to the Attorney General or prosecutors does not constitute enforcement;

- six provisions governing the process of accepting mail-in-ballot and early-voting applications because the acceptance of such documents is statutorily assigned to local election officials like early voting clerks, signature verification committees, and early voting ballot boards; and

- six provisions concerning early voting sites and the printing of ballots, because they are enforced by local election officials like election judges.

*Id.* at 262-70. As for the Attorney General, the majority concluded that he has a sufficient connection to the enforcement of one provision that permits him to seek civil penalties against voter registrars. *Id.* at 270-72. But the Court concluded that the Attorney General does not enforce twenty-eight other provisions because he lacks criminal prosecutorial authority under state law and he has no demonstrated willingness to enforce those twenty-eight provisions through a separate civil-penalty provision (even if, as was disputed, he possessed the power to do so under state law). *Id.* at 272-73.

Judge Oldham dissented in part. He explained that this Court's *Ex parte Young* precedent is flawed because it "require[s] *zero* connection between the defendant and the plaintiff." *Id.* at 276 (Oldham, J., concurring in part and dissenting in part). That is, "[i]f the defendant can enforce the state law against *anyone*, then he loses his state sovereign immunity against *everyone*." *Id.* at 278. But this "No Nexus Rule" "eliminates the entire basis for *Ex parte Young* in the first place" and "allows

plaintiffs to sue the state law as a mythical 'defendant' and ask federal courts to 'strike down' laws in contravention of Article III's limits." *Id.* at 276. Under a proper application of *Ex parte Young*, Judge Oldham explained, "the entire suit should be dismissed," *id.*, because "*none* of the challenged provisions can be enforced by either" the Secretary or the Attorney General "against the plaintiffs," *id.* at 279.

A R G U M E N T

## I.  The Court Should Resolve Longstanding Confusion in its Precedent Over the Scope of the *Young* Exception to State Sovereign Immunity.

"The doctrine of state sovereign immunity recognizes the 'residua[l] and inviolable sovereignty' retained by the states in the Constitution's wake." *Russell v. Jones*, 49 F.4th 507, 512 (5th Cir. 2022) (quoting *Alden v. Maine*, 527 U.S. 706, 715 (1999)). "This principle, partially embodied in the Eleventh Amendment, is commonly distilled to the proposition that individuals may not sue a state—either in its own courts, courts of other states, or federal courts—without the state's consent." *Id.* Thus, "unless the state has waived sovereign immunity or Congress has expressly abrogated it," the state sovereign immunity doctrine will bar the suit. *City of Austin*, 943 F.3d at 997.

"The Supreme Court, however, carved out an exception to state sovereign immunity in *Ex parte Young* . . . permitting suits against state actors whose conduct violates federal law." *Haverkamp v. Linthicum*, 6 F.4th 662, 669 (5th Cir. 2021) (per curiam). "'The rule is based on the legal fiction that a sovereign state cannot act unconstitutionally,' and therefore, when 'a state actor enforces an unconstitutional

law, he is stripped of his official clothing and becomes a private person subject to suit.'" *Id.* (quoting *K.P.*, 627 F.3d at 124). "For *Young* to apply, three criteria must be satisfied: (1) A 'plaintiff must name individual state officials as defendants in their official capacities,' *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013); (2) the plaintiff must 'allege an ongoing violation of federal law,' *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); and (3) the relief sought must be 'properly characterized as prospective,' *id.*" *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020) (en banc).

But "[i]n conducting [the] *Ex parte Young* analysis," the Court "first consider[s] whether the plaintiff has named the proper defendant or defendants." *City of Austin*, 943 F.3d at 998. That is because, "[f]or the exception to apply, the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party.'" *Id.* at 997 (quoting *Young*, 209 U.S. at 157). Thus, "[t]o be amenable to suit under the doctrine, the state actor must both possess 'the authority to enforce the challenged law' and have a 'sufficient connection [to] the enforcement' of the challenged act." *Haverkamp*, 6 F.4th at 670 (quoting *Young*, 209 U.S. at 157).

"How much of a 'connection' has been hard to pin down, though." *TARA*, 28 F.4th at 672. As panels of this Court routinely acknowledge, this "circuit has not spoken with conviction" on this issue, *TDP II*, 978 F.3d at 179, and its precedents "do not provide as much clarity as we would prefer," *Tex. Democratic Party v. Hughs*,

860 F. App'x 874, 877 (5th Cir. 2021) (per curiam) ("*TDP III*"). Because the Court has "not outlined a clear test for when a state official is sufficiently connected to the enforcement of a state law so as to be a proper defendant under *Ex parte Young*," that means "[a]pplying our precedents in this area is no easy task." *TDP IV*, 997 F.3d at 291 & n.12.

Twenty-five years ago in *Okpalobi*, a plurality of the en banc Court traced the development of *Young*'s "some connection" test and concluded that "*Young* requires both a close connection between the official and the act and the threatening or commencement of enforcement proceedings by the official." 244 F.3d at 415. It explained that this "close connection" or "special relationship" between the official and the law in question occurs where the official is "'*specially charged* with the execution of a state enactment alleged to be unconstitutional.'" *Id.* at 413 (quoting *Fitts v. McGhee*, 172 U.S. 516, 529 (1899)).

But because this opinion garnered only a plurality, it is "[a]n open question . . . whether [this] court has adopted" the special-charge rule "as binding precedent." *TARA*, 28 F.4th at 672 n.5. Some panels have applied it, inquiring whether a challenged law "specially task[s]" a defendant "with its enforcement." *Morris*, 739 F.3d at 746. Other panels have rejected *Okpalobi*'s articulation of *Young*'s "some connection" test because its "analysis is not binding precedent." *K.P.*, 627 F.3d at 124. Still other panels have taken note of the tension in this Court's precedent without weighing in on either side. *See City of Austin*, 943 F.3d at 999-1003; *Air Evac*, 851 F.3d at 517-19.

This Court has lately attempted to distill its precedents by channeling the "some connection" inquiry into three "guideposts" that, consistent with *Okpalobi*, require a tighter connection between the state official and the challenged law. *TARA*, 28 F.4th at 672; *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 785-86 (5th Cir. 2024); *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024); *see also United States v. Abbott*, 85 F.4th 328, 334-36 (5th Cir. 2023) (applying similar analysis).

Yet, other panels interpret and apply one panel's statement that "this circuit's caselaw requires some scintilla of 'enforcement' by the relevant state official with respect to the challenged law," *City of Austin*, 943 F.3d at 1002, to endorse an analytic approach that tolerates a far looser connection between the state-official defendant and the challenged law. *See TDP II*, 978 F.3d at 179 ("A 'scintilla of "enforcement" by the relevant state official with respect to the challenged law' will do."); *Jackson v. Wright*, 82 F.4th 362, 367 (5th Cir. 2023) (applying *TDP II*'s interpretation of *City of Austin*); *Book People*, 91 F.4th at 335 (same); *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 396 (5th Cir. 2025) (same); *cf. Abbott*, 85 F.4th at 340 (Stewart, J., dissenting) (faulting the majority for not applying the "mere 'scintilla'" test). Thus, as one panel noted, "our opinions have ranged from requiring a heightened 'special relationship' to a mere 'scintilla' of enforcement by the relevant state official." *TDP III*, 860 F. App'x at 877 (citing *TDP II*, 978 F.3d at 179).

This longstanding, entrenched, and acknowledged intra-circuit confusion is ripe for the en banc Court's resolution. The Court should grant the petition to "secure or maintain uniformity of the court's decisions." Fed. R. App. P. 40(b)(2)(A).

## II. This Appeal is an Ideal Vehicle for Resolving this Issue Because the Panel's Decision Conflicts with *Young* and this Court's Precedent.

This appeal also presents an ideal vehicle for resolving the tension in this Court's precedent regarding the scope of *Young*'s "some connection" test. The panel held that Texas's Secretary of State and Attorney General possess a sufficient connection to the enforcement of more than a dozen provisions of Texas election law even though it is undisputed that neither official can enforce those provisions of the Election Code against any of the Plaintiffs; at most, they can enforce these provisions against third-party local election officials not before the Court. That type of analysis is inconsistent with *Young* itself and strands of this Court's precedent applying it. En banc review is warranted to remedy these conflicts. Fed. R. App. P. 40(b)(2)(A), (B).

Start with *Young* itself. As Judge Oldham correctly explained, "[t]he *Ex parte Young* Court emphatically did not announce some freestanding federal judicial power to enjoin state laws." *LUPE*, 163 F.4th at 277 (Oldham, J., concurring in part and dissenting in part). Instead, "it is critical to the entire *Ex parte Young* doctrine that the defendant state official is threatening to enforce an unconstitutional state law *against the plaintiff*." *Id.* That is why, after the Court in *Young* explained that the defendant state "officer must have some connection with the enforcement of the" challenged state law, 209 U.S. at 157, it explained that a proper defendant is one who "commit[s], under [his] authority, some specific wrong or trespass, to *the injury of plaintiff's* rights," *id.* at 158 (emphasis added), and emphasized that any injunction remedying that injury would "restrain[] the state officer from taking any steps towards the enforcement of an unconstitutional enactment, *to the injury of*

10

*complainant*," *id.* at 159 (emphasis added). But contrary to *Young*, the panel's analysis permits Plaintiffs' claims to proceed regardless of whether the state-official defendant is the one who inflicts the injury on the plaintiff.

The panel's analysis is also inconsistent with this Court's own precedent. The panel permits Plaintiffs' claims to proceed against the Secretary as to three provisions of S.B.1 that govern the maintenance of voter rolls, *LUPE*, 163 F.4th at 258-61, which Plaintiffs allege burden the right to vote, *id.* at 280 (Oldham, J., concurring in part and dissenting in part). And it authorized Plaintiffs' claims to proceed against the Attorney General as to one provision that authorizes him to seek civil penalties against voter registrars who do not comply with the Election Code's requirements regarding the maintenance of voter rolls. *Id.* at 270-72 (majority op.).

The panel did so, not because the Secretary or Attorney General can enforce these provisions against any of the Plaintiffs but instead because they can enforce those laws against third-party local election officials who might in turn enforce the challenged laws against Plaintiffs. For example, the panel reasoned that "[t]he Secretary plays the central role under state law of notifying registrars of those whose names should be removed from voter registration lists" and can sanction non-compliant voter registrars for failing to do so. *Id.* at 259. And it held that the fact "[t]hat others also play a part in enforcement [against Plaintiffs] does not erase the Attorney General's role in enforcing state laws through the imposition of civil penalties on local officials who refuse to carry out their obligations under state law." *Id.* at 270.

Permitting a plaintiff to satisfy *Young* because the defendant forms one link in a hypothetical chain of enforcement against the plaintiff, however far removed, is inconsistent with this Court's precedent, which "is clear that it is not enough that the state official was merely the but-for cause of the problem that is at issue in the lawsuit." *TDP III*, 860 F. App'x at 877. The Court has applied that rule in a series of cases rejecting *Young*'s applicability to gubernatorial executive orders, including orders by the Governor that expressly task state agencies with enforcement, *see Abbott*, 85 F.4th at 334-35; *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467 (5th Cir. 2020), and to letters warning about possible criminal violations of the Election Code sent by the Attorney General to third party "judges and election officials, not to the plaintiffs," *TDP II*, 978 F.3d at 181; *see also In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020) (rejecting *Young*'s applicability to a press release by the Attorney General threatening enforcement of Governor's executive order). Under the panel's approach, these cases should have come out the other way because the Governor and Attorney General formed one link in the chain of causation as to the enforcement of the executive orders and letters in question.

The panel's conclusion that the Secretary enforces eleven provisions of S.B.1 that articulate new substantive requirements for voters who wish to partake in early voting or mail-in voting or obtain voter assistance, *LUPE*, 163 F.4th at 260-62, similarly conflicts with this Court's precedent. Applying *TDP II*, the panel reasoned that the Secretary enforces these provisions because she designs the forms that make space for voters to provide the new information required by S.B.1, and local officials

must use those forms. *Id.* at 261-62 (citing *TDP II*, 978 F.3d at 180). That rule conflicts with other precedents of this Court, because it reflects the kind of but-for causation analysis that other panels have rejected. *See supra* at 11-12.

But even assuming that merely designing the forms local officials use were enough, this analysis overlooks that "[h]ere, Plaintiffs challenge not the . . . forms" themselves "but how local officials" use them. *Richardson v. Flores*, 28 F.4th 649, 654 n.9 (5th Cir. 2022). That is, Plaintiffs' allegations focus on the substantive requirements of S.B.1, but merely preventing the Secretary from designing the forms would not relieve local election officials of their independent legal obligations under the Election Code to, for example, maintain voter rolls and apply early-voting requirements.

Maintaining that careful distinction is critical "because the Texas Election Code delineates between the authority of the Secretary of State and local officials." *TARA*, 28 F.4th at 672 (quoting *TDP II*, 978 F.3d at 179). For example, section 5.02 of S.B.1 requires a mail-in-voting application to include an individual's driver's license number or social security number, Tex. Elec. Code § 84.002(a)(1),(1-a), and section 5.03 requires the official application form, created by the Secretary, to include a space for entering that information, *id.* § 84.011(a)(3-a). Plaintiffs do not take issue with the form itself (section 5.03)—which applicants are not even required to use, *id.* §84.001(c)—but instead with the substantive requirement to provide an identification number (section 5.02). *See, e.g.*, ROA.6648. So, enjoining the Secretary from creating the form (or space on the form) would not solve their

problem: local election officials (early voting clerks) have an independent obligation under state law to "reject the application" if it is nonconforming. Tex. Elec. Code § 86.001(c), (f). And because "enjoining the Secretary to change the balloting forms 'would not afford the Plaintiffs the relief that they seek,'" by somehow authorizing early voting clerks to accept mail-in-voting applications that omit the identification requirements, "the Secretary of State is not a proper defendant." *Richardson*, 28 F.4th at 654 (quoting *Mi Familia Vota*, 977 F.3d at 467-68).

The panel's conclusion to the contrary violates these principles and amounts to "a writ of erasure: The federal court is entertaining a suit against the purportedly unconstitutional statute itself." *LUPE*, 163 F.4th at 279 (Oldham, J., concurring in part and dissenting in part). But "[f]ederal courts cannot 'strike down' statutes as unconstitutional" because "[d]oing so is inconsistent with limits on [the Court's] equitable powers and the power of judicial review." *Id.* (citing Jonathan F. Mitchell, *The Writ of Erasure Fallacy*, 104 Va. L. Rev. 933 (2018)); *see also Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) ("Consistent with historical practice," "no court may 'lawfully enjoin the world at large' or purport to enjoin challenged 'laws themselves.'"). The Court should thus grant the petition to resolve these inconsistencies in its precedent.

## Conclusion

The Court should grant the petition for rehearing en banc.

Respectfully submitted.

Ken Paxton
Attorney General of Texas

William R. Peterson
Solicitor General

Brent Webster
First Assistant Attorney General

/s/ William F. Cole
William F. Cole
Principal Deputy Solicitor General
William.Cole@oag.texas.gov

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Counsel for Defendants-Appellants*

## Certificate of Compliance

This petition complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 40(d)(3)(A) because it contains 3,803 words; and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count). *See* Fed. R. App. P. 27(d)(1)(E).

/s/ William F. Cole

WILLIAM F. COLE

# In the United States Court of Appeals for the Fifth Circuit

La Union del Pueblo Entero; Friendship-West Baptist Church; Anti-Defamation League Austin, Southwest, and Texoma; Southwest Voter Registration Education Project; Texas Impact; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; JOLT Action; William C. Velazquez Institute; James Lewin; Fiel Houston, Incorporated,

*Plaintiffs-Appellees,*

*v.*

Jane Nelson, In Her Official Capacity as Texas Secretary of State; Ken Paxton, In His Official Capacity as Attorney General of Texas; State of Texas,

*Defendants-Appellants,*

consolidated with
No. 22-50777

Mi Familia Vota; Marla Lopez; Marlon Lopez; Paul Rutledge,

*Plaintiffs-Appellees,*

*v.*

Gregory W. Abbott, In His Official Capacity as Governor of Texas; Jane Nelson, In Her Official Capacity as Secretary of State of Texas; Ken Paxton, In His Official Capacity as Attorney General of Texas,

*Defendants-Appellants,*

DELTA SIGMA THETA SORORITY, INCORPORATED; HOUSTON
AREA URBAN LEAGUE, THE ARC OF TEXAS; JEFFREY LAMAR
CLEMMONS,

*Plaintiffs-Appellees,*

*v.*

GREGORY WAYNE ABBOTT, IN HIS OFFICIAL CAPACITY AS THE
GOVERNOR OF TEXAS, KEN PAXTON, IN HIS OFFICIAL CAPACITY
AS THE ATTORNEY GENERAL OF TEXAS,

*Defendants-Appellants,*

MI FAMILIA VOTA; MARLA LOPEZ; MARLON LOPEZ; PAUL
RUTLEDGE,

*Plaintiffs-Appellees,*

*v.*

GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF
TEXAS; JANE NELSON, IN HER OFFICIAL CAPACITY AS TEXAS
SECRETARY OF STATE; KEN PAXTON, IN HIS OFFICIAL CAPACITY
AS ATTORNEY GENERAL OF TEXAS,

*Defendants-Appellants,*

consolidated with
No. 22-50778

LA UNION DEL PUEBLO ENTERO; ET AL,

*Plaintiffs,*

*v.*

GREGORY W. ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR
OF TEXAS; ET AL,

*Defendants,*

OCA-Greater Houston; League of Women Voters of
Texas; REVUP-Texas,

*Plaintiffs-Appellees*,

*v.*

Jane Nelson, In Her Official Capacity as Texas Secretary
of State; Ken Paxton, Attorney General, State of Texas

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

# APPENDIX

Panel Opinion (Filed December 31, 2025) ............................................................1

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 31, 2025

Lyle W. Cayce
Clerk

No. 22-50775

LA UNION DEL PUEBLO ENTERO; FRIENDSHIP-WEST BAPTIST
CHURCH; ANTI-DEFAMATION LEAGUE AUSTIN, SOUTHWEST,
and TEXOMA; SOUTHWEST VOTER REGISTRATION EDUCATION
PROJECT; TEXAS IMPACT; MEXICAN AMERICAN BAR
ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR
POLITICAL EDUCATION; JOLT ACTION; WILLIAM C.
VELASQUEZ INSTITUTE; JAMES LEWIN; FIEL HOUSTON,
INCORPORATED,

*Plaintiffs—Appellees,*

*versus*

JANE NELSON, *In Her Official Capacity as Texas Secretary of State*; KEN
PAXTON, *In His Official Capacity as Attorney General of Texas*; STATE OF
TEXAS,

*Defendants—Appellants,*

CONSOLIDATED WITH

No. 22-50777

MI FAMILIA VOTA; MARLA LOPEZ; MARLON LOPEZ; PAUL
RUTLEDGE,

*Plaintiffs—Appellees,*

*versus*

GREGORY W. ABBOTT, *In His Official Capacity as Governor of Texas*; JANE NELSON, *In Her Official Capacity as Secretary of State of Texas*; KEN PAXTON, *In His Official Capacity as Attorney General of Texas*,

*Defendants—Appellants*,

————————————

DELTA SIGMA THETA SORORITY, INCORPORATED; HOUSTON AREA URBAN LEAGUE, THE ARC OF TEXAS; JEFFREY LAMAR CLEMMONS,

*Plaintiffs—Appellees*,

*versus*

GREGORY WAYNE ABBOTT, *In His Official Capacity as the Governor of Texas*; KEN PAXTON, *In His Official Capacity as the Attorney General of Texas*,

*Defendants—Appellants*,

————————————

MI FAMILIA VOTA; MARLA LOPEZ; MARLON LOPEZ; PAUL RUTLEDGE,

*Plaintiffs—Appellees*,

*versus*

GREG ABBOTT, *In His Official Capacity as Governor of Texas*; JANE NELSON, *In Her Official Capacity as Texas Secretary of State*; KEN PAXTON, *In His Official Capacity as Attorney General of Texas*,

*Defendants—Appellants*,

CONSOLIDATED WITH

---

No. 22-50775

---

LA UNION DEL PUEBLO ENTERO; ET AL.,

*Plaintiffs*,

*versus*

GREGORY W. ABBOTT, *In His Official Capacity as Governor of Texas*; ET AL.,

*Defendants*,

---

OCA-GREATER HOUSTON; LEAGUE OF WOMEN VOTERS OF TEXAS; REVUP-TEXAS,

*Plaintiffs—Appellees*,

*versus*

JANE NELSON, *In Her Official Capacity as Texas Secretary of State*; KEN PAXTON, *Attorney General, State of Texas*,

*Defendants—Appellants*.

---

Appeals from the United States District Court
for the Western District of Texas
USDC Nos. 5:21-CV-844,
5:21-CV-848, 5:21-CV-920

---

Before Richman, Southwick, and Oldham, *Circuit Judges*.

Priscilla Richman, *Circuit Judge*:

Texas Secretary of State Jane Nelson and Texas Attorney General Ken Paxton appeal the district court's denial of their motions to dismiss for lack of jurisdiction based on sovereign immunity and standing in this lawsuit challenging certain provisions of Texas's Election Protection and Integrity Act of 2021. The Secretary and the Attorney General argue they are not sufficiently connected to the enforcement of the challenged provisions to strip them of their sovereign immunity under *Ex parte Young*,[1] and, for many of the same reasons, they argue the plaintiffs have not met the traceability prong of standing. Plaintiffs, in response, dispute these points and argue that we do not have appellate jurisdiction under the collateral-order doctrine because a conclusion that the defendants have sovereign immunity would not dispose of all the remaining claims in the lawsuit. We conclude we have jurisdiction, vacate in part, and affirm in part.

## I

In the wake of the 2020 election, which took place during in the midst of the COVID-19 pandemic, the Texas Legislature passed the Election Protection and Integrity Act of 2021, an omnibus election law referred to as S.B.1.[2] The purpose of S.B.1, as the Texas Legislature explained, was to ensure that "application of th[e] [Texas Election] [C]ode and the conduct of elections be uniform and consistent throughout this state to reduce the likelihood of fraud in the conduct of elections, protect the secrecy of the

---

[1] 209 U.S. 123 (1908).

[2] ROA.6536, 6562-66; *see* Election Integrity Protection Act of 2021, 87th Leg., 2d C.S., ch. 1, §§ 1.01-10.04, 2021 Tex. Gen. Laws 3873, 3873-903 (codified at Tex. Elec. Code § 1.001 et seq.) (S.B.1).

No. 22-50775
c/w Nos. 22-50777, 22-50778

ballot, promote voter access, and ensure that all legally cast ballots are counted."[3] After Texas Governor Greg Abbott signed it into law, S.B.1 went into effect in late 2021.[4] It amended the Texas Election Code in various ways, including making changes to voter registration, early voting, vote-by-mail applications, and voter assistance.[5]

In the days before and after S.B.1 was signed into law, three groups of plaintiffs sued, alleging that various provisions violate the U.S. Constitution or federal statutes.[6]

The LUPE Plaintiffs[7] sought to enjoin twenty-three provisions of S.B.1.[8] They asserted five constitutional claims under 42 U.S.C. § 1983—alleging three Fourteenth Amendment violations, one First Amendment violation, and one Fifteenth Amendment violation—and three statutory claims under Title II of the Americans with Disabilities Act (ADA) and §§ 2 and 208 of the Voting Rights Act (VRA) against the Texas Secretary of State

---

[3] S.B.1 § 1.04 (codified at Tex. Elec. Code § 1.0015).

[4] *See La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 449, 460-61 (W.D. Tex. 2022); ROA.6566; ROA.10724.

[5] *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 461; ROA.10724. *See generally* S.B.1.

[6] *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 461; *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 504, 516 (W.D. Tex. 2022); ROA.10725.

[7] The LUPE Plaintiffs include La Unión del Pueblo Entero, Friendship-West Baptist Church, the Anti-Defamation League Austin, Southwest, and Texoma Regions, the Southwest Voter Registration Education Project, Texas Impact, the Mexican American Bar Association of Texas, Texas Hispanics Organized for Political Education, Jolt Action, the William C. Velasquez Institute, FIEL Houston Inc., and James Lewin (collectively LUPE Plaintiffs). ROA.6604-09.

[8] ROA.6664-85. The LUPE Plaintiffs challenge §§ 2.04, 2.06, 2.07, 2.08, 2.11, 3.04, 3.09, 3.10, 3.12, 3.13, 4.01, 4.06, 4.07, 4.09, 5.07, 5.13, 6.01, 6.03, 6.04, 6.05, 6.06, 7.04, and 8.01. *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 516; ROA.6664-85.

No. 22-50775
c/w Nos. 22-50777, 22-50778

and Attorney General.[9]  They also asserted the VRA claims against the State of Texas.[10]

The MFV Plaintiffs[11] sought to enjoin thirty-three provisions of S.B.1.[12]  They asserted four constitutional claims under 42 U.S.C. § 1983—alleging three Fourteenth Amendment violations and one Fifteenth Amendment violation—and three statutory claims under Title II of the ADA and §§ 2 and 208 of the VRA against the Secretary and Attorney General.[13] They also asserted the VRA claims against the Governor.[14]  Nineteen of the provisions challenged by the MFV Plaintiffs overlap with the twenty-three provisions challenged by the LUPE Plaintiffs.[15]

---

[9] *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 516-17; ROA.6664-85.

[10] *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 516-17; ROA.6664-85.

[11] The MFV Plaintiffs include Mi Familia Vota, Houston Justice, Houston Area Urban League, Delta Sigma Theta Sorority, Inc., The Arc of Texas, Marla López, Marlon López, Paul Rutledge, and Jeffrey Lamar Clemmons (collectively MFV Plaintiffs). ROA.6126.  The MFV Plaintiffs were referred to as the HAUL Plaintiffs by the district court below.  ROA.10590.

[12] The MFV Plaintiffs challenge §§ 2.05, 2.06, 2.07, 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 4.12, 5.01, 5.02, 5.03, 5.04, 5.06, 5.07, 5.08, 5.10, 5.11, 5.12, 5.13, 5.14, 6.01, 6.03, 6.04, 6.05, 6.07, 7.02, and 7.04.  *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 461; ROA.6217-53.

[13] *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 461-62; ROA.6217-53.

[14] *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 461-62; ROA.6217-53.

[15] *Compare supra* n.8, *with supra* n. 12.

No. 22-50775
c/w Nos. 22-50777, 22-50778

The OCA Plaintiffs[16] sought to enjoin nine provisions of S.B.1.[17] They asserted two constitutional claims under § 1983—alleging one First Amendment violation and one Fourteenth Amendment violation—and three statutory claims under Title II of the ADA, § 504 of the Rehabilitation Act, and § 208 of the VRA against the Secretary and Attorney General.[18] The OCA Plaintiffs asserted additional claims under § 101 of the Civil Rights Act,[19] Title II of the ADA, and § 504 of the Rehabilitation Act against the Secretary.[20] Four of the provisions challenged by the OCA Plaintiffs were also challenged by the LUPE Plaintiffs, and all nine were challenged by the MFV Plaintiffs.[21]

Altogether, the plaintiffs challenge thirty-eight provisions of S.B.1: §§ 2.04, 2.05, 2.06, 2.07, 2.08, 2.11, 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 4.12, 5.01, 5.02, 5.03, 5.04, 5.06, 5.07, 5.08, 5.10, 5.11, 5.12, 5.13, 5.14, 6.01, 6.03, 6.04, 6.05, 6.06, 6.07, 7.02, 7.04, and 8.01.[22]

---

[16] The OCA Plaintiffs include OCA-Greater Houston; League of Women Voters of Texas; REVUP-Texas; Texas Organizing Project; and Workers Defense Action Fund (collectively OCA Plaintiffs). ROA.6263-71. Workers Defense Action Fund is no longer part of this appeal. ECF 187.

[17] The OCA Plaintiffs challenge §§ 5.02, 5.03, 5.06, 5.07, 5.10, 5.12, 6.04, 6.06, and 7.04. *See La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 398 (W.D. Tex. 2022); ROA.6303-33.

[18] *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 398-99; ROA.6303-33.

[19] The OCA Plaintiffs also brought their claim under § 101 of the Civil Rights Act through the cause of action provided by 42 U.S.C. § 1983. *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 398; ROA. 6303-04.

[20] *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 398; ROA.6303-33.

[21] *Compare supra* n. 8, *with supra* n. 12, *and supra* n. 17.

[22] *See supra* nn. 8, 12, 17.

No. 22-50775
c/w Nos. 22-50777, 22-50778

The challenged provisions in article two of S.B.1 deal primarily with the registration of voters, eligibility for registration, and the maintenance of voter rolls.[23] Section 2.04 requires that if a voter registrar determines that a person who is not eligible to vote is nevertheless registered to vote or has voted, he or she must, within 72 hours, deliver an affidavit "stating the relevant facts" to the Secretary, Attorney General, and the appropriate county or district attorney.[24] Section 2.05 requires the Secretary to "enter into an agreement with the Department of Public Safety" to compare information in the "statewide computerized voter registration list . . . against information in the database of the Department of Public Safety . . . to verify the accuracy of citizenship status information previously provided on voter registration applications."[25] Section 2.06 requires the Secretary to sanction a voter registrar who fails to comply substantially with the Secretary's rules regarding the computerized voting list by mandating training, conducting audits of that county's voter registration lists, and, on a third violation, "inform[ing] the attorney general that the county which the registrar serves may be subject to a civil penalty."[26] Section 2.07 requires the Secretary to make quarterly comparisons between the information in the "statewide computerized voter registration list" and the "database of the Department of Public Safety" and notify the voter registrar if she determines that a voter on the registration list no longer lives in the county where that person is registered to vote.[27]

---

[23] *See* S.B.1 Art. II.

[24] *Id.* § 2.04 (codified at Tex. Elec. Code § 15.028).

[25] *Id.* § 2.05 (codified at Tex. Elec. Code § 16.0332(a), (a-1)).

[26] *Id.* § 2.06 (codified at Tex. Elec. Code § 18.065(e), (f)).

[27] *Id.* § 2.07 (codified at Tex. Elec. Code § 18.068(a)).

The challenged provisions in article three pertain to the conduct and security of elections.[28]  Section 3.04 prohibits early voting "from inside a motor vehicle" unless the voter is unable to enter the polling place.[29] Sections 3.09 and 3.10 adopt new procedures for early voting such as: increasing the mandatory early voting hours to at least nine hours per day during weekdays; requiring that voters who are in line at the scheduled closing time still be allowed to vote; extending early voting hours for weekends; and decreasing the county-population threshold for counties eligible to participate in extended early voting.[30]  Sections 3.12 and 3.13 require that polling places be located inside physical buildings and prohibit polling places from being within "movable structure[s]."[31]  Section 3.15 prohibits single-choice straight-ticket voting.[32]

The challenged provisions in article four address the conduct of election officers and poll watchers.[33]  Section 4.01 forbids a presiding election judge from removing a poll watcher for an election-law violation unless an election judge or clerk observed the violation.[34]  Section 4.06 makes it a misdemeanor for "[a]n election officer" to "intentionally or knowingly refuse[] to accept a watcher for service" when required by law.[35]  Section

---

[28] *See id.* Art. III.

[29] *Id.* § 3.04 (codified at TEX. ELEC. CODE § 43.031(b)).

[30] *Id.* §§ 3.09, 3.10 (codified at TEX. ELEC. CODE §§ 85.005, 85.006(e)). Section 85.006(e) has since been repealed. *See* Act of June 22, 2025, 89th Leg., R.S., ch. 1184, 2025 Tex. Sess. Law Serv. ch. 1184 (S.B. 2753) (repealing TEX. ELEC. CODE § 85.006).

[31] *Id.* §§ 3.12, 3.13 (codified at TEX. ELEC. CODE §§ 85.061(a), 85.062(b)).

[32] *Id.* § 3.15 (codified at TEX. ELEC. CODE § 124.002(c)).

[33] *See id.* Art. IV.

[34] *Id.* § 4.01 (codified at TEX. ELEC. CODE § 32.075(g)).

[35] *Id.* § 4.06 (codified at TEX. ELEC. CODE § 33.051(g)).

4.07 clarifies the scope of poll watchers' permitted activities, providing (among other things) that they must be allowed free movement generally and must be allowed to sit or stand near enough to see or hear relevant voting activity.[36] Section 4.09 makes it a misdemeanor to obstruct a poll watcher unlawfully.[37] Section 4.12 requires that early voting ballots be delivered in person and received by an election official who "record[s] the voter's name, signature, and type of identification" evidence on a form prescribed by the Secretary.[38]

The challenged provisions in article five amend the vote-by-mail procedures and impose new requirements for vote-by-mail applications.[39] Sections 5.01 and 5.02 impose new requirements on mail-in-ballot-application forms, including a wet-signature requirement and a requirement to list the applicant's driver's license number or other form of identification.[40] Sections 5.03 and 5.08 require that the vote-by-mail application, mail-in-ballot carrier envelope, and online tracking application for mail-in ballots include a space for entering this new information.[41] Section 5.04 prohibits "an officer or employee of this state or of a political subdivision" from giving a vote-by-mail application "to a person who did not request an application."[42] Section 5.06 allows the election judge to permit a voter who has cancelled his or her vote-by-mail application to cast a

---

[36] *Id.* § 4.07 (codified at Tex. Elec. Code § 33.056(a), (e)).

[37] *Id.* § 4.09 (codified at Tex. Elec. Code § 33.061).

[38] *Id.* § 4.12 (codified at Tex. Elec. Code § 86.006(a-2)).

[39] *See id.* Art. V.

[40] *Id.* §§ 5.01, 5.02 (codified at Tex. Elec. Code §§ 84.001(b)), 84.002(1-a)).

[41] *Id.* §§ 5.03, 5.08, 5.10 (codified at Tex. Elec. Code §§ 84.011(a)(3-a), 86.002(g), 86.015(c)(4)).

[42] *Id.* § 5.04 (codified at Tex. Elec. Code § 84.0111).

provisional ballot.[43]  Section 5.07 directs the early voting clerk to reject vote-by-mail applications that do not include the required information, notify the applicant of any rejection, and give the applicant an opportunity to cure the defects.[44]  Section 5.10 directs the Secretary to "develop or otherwise provide an online tool" to "allow a voter to add or correct" the information required by Sections 5.02 and 5.08.[45]  Sections 5.12, 5.13, and 5.14 provide additional detail regarding how mail-in voters may correct defects in submitted ballots.[46]

The challenged provisions in article six create new obligations for people assisting voters in casting their ballots.[47]  Section 6.01 requires anyone who simultaneously transports seven or more curbside voters to a polling place to fill out a form, provided by an election officer, that identifies the transporter's name and address and whether that person is also helping voters in filling out the ballot.[48]  Section 6.03 requires a voter assistor to complete a form listing the assistor's name and address, stating the assistor's relationship to the voter, and specifying whether the assistor received any compensation or benefit from a candidate, campaign, or political committee.[49]  Section 6.04 requires an assistor to take an oath, administered by the local election officer, swearing that the voter is eligible to receive assistance and that the assistor will assist the voter within the confines of the

---

[43] *Id.* § 5.06 (codified at TEX. ELEC. CODE § 84.035(b)).

[44] *Id.* § 5.07 (codified at TEX. ELEC. CODE § 86.001(f), (f-1)).

[45] *Id.* § 5.10 (codified at TEX. ELEC. CODE §§ 86.015(a), (c)(4)).

[46] *Id.* §§ 5.13, 5.14 (codified at TEX. ELEC. CODE §§ 87.021, 87.041(b)(8), 87.0411).

[47] *See id.* Art. VI.

[48] *Id.* § 6.01 (codified at TEX. ELEC. CODE § 64.009(f)).

[49] *Id.* § 6.03 (codified at TEX. ELEC. CODE § 64.0322).

No. 22-50775
c/w Nos. 22-50777, 22-50778

law.[50]   Section 6.05 requires an assistor to repeat the information from Section 6.03 on the voter's mail-in-ballot carrier envelope.[51]   Section 6.07 requires the mail-in-ballot carrier envelope include a space for indicating the relationship of an assistor to the voter.[52]   Section 6.06 makes it a felony to compensate someone, to offer to compensate someone, or to solicit, receive, or accept compensation for assisting voters.[53]

The challenged provisions in articles seven and eight define new election-law crimes and establish civil penalties for election officials who violate provisions of the Texas Election Code.[54]   Section 7.02 clarifies that it is a misdemeanor for an employer to prohibit an employee from voting during both election day and the early voting period.[55]   Section 7.04 creates several new election crimes: engaging in vote harvesting, unlawfully soliciting and distributing vote-by-mail applications or early voting ballots and balloting materials, perjury in connection with election procedures, and unlawfully altering election procedures.[56]   Section 8.01 defines who may be an election official, establishes the circumstances under which an election official might be subject to civil penalties, and creates a cause of action against an election officer.[57]

---

[50] *Id.* § 6.04 (codified at Tex. Elec. Code § 64.034).

[51] *Id.* § 6.05 (codified at Tex. Elec. Code § 86.010(e)).

[52] *Id.* § 6.07 (codified at Tex. Elec. Code § 86.013(b)).

[53] *Id.* § 6.06 (codified at Tex. Elec. Code § 86.0105).

[54] *See id.* Arts. VII, VIII.

[55] *Id.* § 7.02 (codified at Tex. Elec. Code § 276.004).

[56] *Id.* § 7.04 (codified at Tex. Elec. Code §§ 276.015, 276.016, 276.017, 276.018, 276.019).

[57] *Id.* § 8.01 (codified at Tex. Elec. Code §§ 31.128, 31.129, 31.130).

No. 22-50775
c/w Nos. 22-50777, 22-50778

The Secretary, Attorney General, State of Texas, and Governor filed motions to dismiss each of the plaintiffs' complaints on, as relevant to this appeal, sovereign immunity and standing grounds.[58] The district court analyzed each motion on a provision-by-provision basis, granting and denying parts of each.[59] The district court concluded the Secretary and Attorney General did not have sovereign immunity—and the plaintiffs did have standing—for the majority of the challenged provisions.[60] The district court dismissed the claims challenging the remaining provisions as moot, on standing grounds, or for failure to state a claim, concluding that the Secretary, Attorney General, or Governor did not enforce several provisions.[61] The plaintiffs did not appeal these dismissals. The Attorney General and Secretary, however, appealed the district court's denial of their motions to dismiss.[62] They then filed an unopposed motion to consolidate these appeals, which this court granted.

---

[58] ROA.10726; *see also* ROA.7204-20.

[59] *See La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 504 (W.D. Tex. 2022) (Order Granting in Part and Denying in Part Motion to Dismiss the LUPE Plaintiffs' claims); *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 449 (W.D. Tex. 2022) (Order Granting in Part and Denying in Part the Motion to Dismiss the MFV Plaintiffs' claims); *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388 (W.D. Tex. 2022) (Order Granting in Part and Denying in Part the Motion to Dismiss the OCA Plaintiffs' claims).

[60] *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 504; ROA.10792 (LUPE); *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 449; ROA.10661 (MFV); *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 388; ROA.10723 (OCA).

[61] *See La Unión del Pueblo Entero*, 618 F. Supp. 3d at 504; ROA.10792 (LUPE); *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 449; ROA.10661 (MFV); *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 388; ROA.10723 (OCA).

[62] ROA.10857-62.

No. 22-50775
c/w Nos. 22-50777, 22-50778

## II

"Because the district court's order . . . was not a final judgment resolving all the issues of the suit," we must determine whether we have appellate jurisdiction before reaching the merits of the arguments.[63] Under 28 U.S.C. § 1291, our appellate jurisdiction is limited to final judgments.[64] The Supreme Court, however, "has long given § 1291 a practical rather than a technical construction."[65] Accordingly, § 1291 encompasses final decisions that terminate an action as well as "a small class of collateral rulings that, although they do not end the litigation, are appropriately deemed final."[66] "That small [class] includes only decisions that are conclusive, that resolve important questions separate from the merits, and that are effectively unreviewable on appeal from the final judgment in the underlying questions."[67]   This includes "orders that . . . deny a state's Eleventh Amendment immunity."[68]

---

[63] *BancPass, Inc. v. Highway Toll Admin., L.L.C.*, 863 F.3d 391, 397 (5th Cir. 2017) (alteration in original) (quoting *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 747 (5th Cir. 2014)).

[64] *See* 28 U.S.C. § 1291.

[65] *Leonard v. Martin*, 38 F.4th 481, 486 (5th Cir. 2022) (internal quotation marks omitted) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).

[66] *Id.* (internal quotation marks omitted) (quoting *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106 (2009)).

[67] *BancPass*, 863 F.3d at 397 (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 42 (1995)).

[68] *Leonard*, 38 F.4th at 486 (first citing *Mitchell v. Forsyth*, 472 U.S. 511, 525-27 (1985); and then citing *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993)).

No. 22-50775
c/w Nos. 22-50777, 22-50778

## A

The issue is whether we have jurisdiction over an interlocutory appeal in which the defendants assert sovereign immunity as to some, but not all, of the claims brought against them in the district court. After briefing in this case was submitted, we held in *Mi Familia Vota v. Ogg*[69] that a state defendant had a right to an interlocutory appeal after she was denied sovereign immunity, even though proper application of sovereign immunity did not lead to the dismissal of all the remaining claims in the case.[70] So too here.

The defendants immediately appealed the district court's sovereign immunity determinations. They do not, however, argue the plaintiffs' ADA and Rehabilitation Act claims are barred by sovereign immunity.[71] Furthermore, the defendants concede that the VRA claims are not barred by sovereign immunity because we have previously held that the VRA "validly abrogated state sovereign immunity."[72] The defendants appeal those claims only to preserve their right to request reconsideration by the en banc court. Because of these claims, OCA and MFV Plaintiffs argue that we do not have interlocutory appellate jurisdiction.

Specifically, those plaintiffs point to language in our decision in *Planned Parenthood Gulf Coast, Inc. v. Phillips*.[73] There, Planned Parenthood asserted two sets of claims against the Louisiana Health Department:

---

[69] 105 F.4th 313 (5th Cir. 2024).

[70] *Id.* at 320, 325.

[71] *See* ROA.10691, 10710.

[72] *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) ("The VRA, which Congress passed pursuant to its Fifteenth Amendment enforcement power, validly abrogated state sovereign immunity.").

[73] 24 F.4th 442 (5th Cir. 2022).

licensing and funding claims.[74]  The Department moved to dismiss those claims, arguing that sovereign immunity barred the licensing claims and "the funding claims were enveloped by and contingent on the licensing claims."[75] In other words, the Department argued that a determination that the licensing claims were barred by sovereign immunity would compel a dismissal of the funding claims as well.[76]  The district court denied the motion, and the Department filed an interlocutory appeal.[77]  We concluded we had "jurisdiction [of the appeal] because the Department asserted sovereign immunity from th[e] entire lawsuit."[78]

The OCA and MFV Plaintiffs point to this "entire lawsuit" language to argue that an interlocutory appeal of a denial of sovereign immunity is appropriate only if the sovereign immunity determination leads to the dismissal of all remaining claims in the case.  They assert that this proposition comports with the Supreme Court's decision in *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*,[79] which established a state's ability to appeal a denial of sovereign immunity under the collateral-order doctrine.[80]

Our decision in *Ogg* rejected these arguments.  First, *Ogg* concluded that "the general considerations for allowing interlocutory appeals give meaningful support to allowing an appeal from the denial of sovereign

---

[74] *Id.* at 446-47.

[75] *Id.* at 449.

[76] *Id.* at 447-48.

[77] *Id.* at 448.

[78] *Id.* at 450.

[79] 506 U.S. 139 (1993).

[80] *Id.* at 147.

No. 22-50775
c/w Nos. 22-50777, 22-50778

immunity over some but not all claims."[81]  Second, *Ogg* examined relevant caselaw from the Supreme Court, the Fifth Circuit, and other circuits, and concluded that none spoke directly to this issue.[82]  Importantly, *Ogg* concluded "that *Planned Parenthood* made no clear holding about the need for complete immunity before the collateral order doctrine could be invoked for an appeal," notwithstanding its "entire lawsuit" language.[83]  Third, *Ogg* noted that the Supreme Court in *Behrens v. Pelletier*[84] permitted interlocutory jurisdiction over an appeal from a denial of *qualified immunity* "when asserted as to fewer than all claims."[85]  When discussing interlocutory appellate jurisdiction in the past, this court has found "no basis for distinguishing cases in which a state's sovereign immunity is questioned" from cases involving "qualified or absolute immunity."[86]

Fourth and finally, *Ogg* considered the costs and consequences of litigation to determine "[w]hether the State's interest in possible immunity from only some claims but not others is significant enough to justify review under the collateral order doctrine."[87]  To this end, *Ogg* first recounted the alleged consequences specific to that litigation[88] before noting that "[t]he

---

[81] *Mi Familia Vota v. Ogg*, 105 F.4th 313, 321 (5th Cir. 2024).

[82] *Id.* at 321-23.

[83] *Id.* at 321-22.

[84] 516 U.S. 299 (1996).

[85] *Ogg*, 105 F.4th at 324.

[86] *Loya v. Tex. Dep't of Corr.*, 878 F.2d 860, 861 (5th Cir. 1989); *see also Medley ex rel. Chrissy F. v. Miss. Dep't of Pub. Welfare*, 925 F.2d 844, 849 (5th Cir. 1991).

[87] *Ogg*, 105 F.4th at 321, 324-25.

[88] *Id.* at 324 ("Ogg contends the denial of sovereign immunity here would have consequences 'in terms of real costs and litigation burdens on state officials, not to mention courts,' where, as here, 'some plaintiffs have sought expansive discovery from . . . [her] and her office.'").

No. 22-50775
c/w Nos. 22-50777, 22-50778

very object and purpose of the [E]leventh [A]mendment were to prevent the indignity of subjecting a [S]tate to the coercive process of judicial tribunals at the instance of private parties"[89]—a consequence present in every sovereign immunity case. *Ogg* "conclude[d] that recognizing jurisdiction *in this case* under the collateral order doctrine is appropriate."[90]

We recognize that some language in this fourth point could be read as requiring case-by-case considerations. Nevertheless, the Supreme Court has emphasized that "appealability determinations are made for classes of decisions, not individual orders in specific cases."[91] Accordingly, we read *Ogg* as making clear that states have a right to an interlocutory appeal after they are denied sovereign immunity, even if proper application of sovereign immunity does not lead to the dismissal of all remaining claims in the case.

In sum, we have jurisdiction to hear the Attorney General and Secretary's appeals of the district court's determination that sovereign immunity does not bar the claims at issue in this interlocutory appeal.

**B**

We also have jurisdiction to address the Secretary's argument that plaintiffs have not met the traceability element of Article III standing for their § 1983 claims. As an initial matter, the OCA Plaintiffs argue the defendants forfeited any arguments about pendant-appellate jurisdiction by not raising it in their opening brief. However, defendants advanced arguments on both sovereign immunity and standing, recognizing the significant overlap. This

---

[89] *Id.* (alterations in original) (quoting *Ex parte Ayers*, 123 U.S. 443, 505 (1887)).

[90] *Id.* at 325 (emphasis added).

[91] *Behrens v. Pelletier*, 516 U.S. 299, 312 (1996).

18

No. 22-50775
c/w Nos. 22-50777, 22-50778

is sufficient to preserve defendants' pendant-appellate jurisdiction argument.[92]

"Pendent appellate jurisdiction may exist where, in the interest of judicial economy, courts have discretion to review interlocutory rulings related to independently appealable orders when the two are 'inextricably intertwined.'"[93] Plaintiffs must rely on the *Ex parte Young* exception to sovereign immunity to assert their § 1983 claims.[94] "This court has acknowledged that our Article III standing analysis and *Ex parte Young* analysis 'significantly overlap.'"[95] While they might not be "identical," "there are notable . . . similarities between" the standing requirements of Article III and the requirements of the *Ex parte Young* exception to sovereign immunity.[96] Thus, we conclude the issues of (1) plaintiffs' standing to bring their § 1983 claims and (2) whether *Ex parte Young* strips defendants of their sovereign immunity as to those claims are "inextricably intertwined" such that we have jurisdiction over both.[97]

*Ogg* is not to the contrary. There, we declined "to exercise pendent appellate jurisdiction to review the district court's determination that the

---

[92] *Cf. United States v. Peterson*, 977 F.3d 381, 394 n.5 (5th Cir. 2020).

[93] *Byrum v. Landreth*, 566 F.3d 442, 449 (5th Cir. 2009) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 43-44, 51 (1995)).

[94] *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013) (recognizing "Congress has not abrogated state sovereign immunity . . . under § 1983").

[95] *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (quoting *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 520 (5th Cir. 2017)).

[96] *Id.*; *see also Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("'[A]t the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy [the connection to the enforcement] element of *Ex parte Young*.").

[97] *Byrum*, 566 F.3d at 449 (quoting *Swint*, 514 U.S. at 43-44, 51).

No. 22-50775
c/w Nos. 22-50777, 22-50778

Plaintiffs[] ha[d] standing to bring *statutory* claims from which [the state defendant was] not immune" after concluding that the state defendant enjoyed sovereign immunity from *constitutional* claims.[98]  We concluded that those issues were not "inextricably intertwined," and we emphasized that the parties' minimal briefing on standing, coupled with our conclusion that sovereign immunity applied, made the appeal "an ill-suited case to address standing at this time."[99]  Here, by contrast, both the standing and sovereign immunity inquiries relate to the same § 1983 claims, the parties thoroughly briefed standing, and we hold below that the Secretary does not enjoy sovereign immunity from challenges to certain provisions.

This said, we do not address plaintiffs' standing to assert their VRA, ADA, and Rehabilitation Act claims, nor do we address the injury-in-fact prong of standing as to any of the claims.[100]  The defendants appeal only plaintiffs' standing to assert their § 1983 claims.   The defendants acknowledge that their "standing arguments focus . . . on the traceability element of Article III standing, not the injury-in-fact element" and "on [p]laintiffs' constitutional claims brought pursuant to [§] 1983 and *Ex parte Young*—not the ADA and Rehabilitation Act claims."  Therefore, we do not reach any standing issues beyond whether plaintiffs' § 1983 claims satisfy the traceability and redressability elements.[101]

---

[98] *Mi Familia Vota v. Ogg*, 105 F.4th 313, 333 (5th Cir. 2024) (emphasis added).

[99] *Id.* at 334.

[100] *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021) (cabining Court's holding on standing to "only redressability" and noting "[i]t remain[ed] for the plaintiff to establish the other elements of standing").

[101] *See also FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1555 (2024) ("The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" (quoting *Sprint Comm'cns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008))).

No. 22-50775
c/w Nos. 22-50777, 22-50778

### III

We turn next to the issue of sovereign immunity. Plaintiffs brought several VRA claims. The VRA validly abrogates sovereign immunity,[102] so we agree with the district court that the VRA claims are not barred by sovereign immunity.[103] Plaintiffs brought their constitutional claims and their claim under § 101 of the Civil Rights Act through the cause of action provided by 42 U.S.C. § 1983, which does not abrogate sovereign immunity.[104] The district court determined that the *Ex parte Young* exception to sovereign immunity permitted plaintiffs to challenge several provisions by asserting claims against the Attorney General and the Secretary.[105] But the Attorney General and Secretary argue that *Ex parte Young* does not strip them of their sovereign immunity.

We review a denial of sovereign immunity *de novo*.[106] Sovereign immunity "prohibits suits against state officials or agencies that are effectively suits against a state."[107] However, *Ex parte Young* provides an exception to this rule that "'allows private parties to bring suits for injunctive or declaratory relief against individual state officials,' but only if those

---

[102] *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017).

[103] *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 504, 548 (W.D. Tex. 2022); ROA.10777 (LUPE); *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 426 (W.D. Tex. 2022); ROA.10710 (OCA); *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 449, 495 (W.D. Tex. 2022); ROA.10646 (MFV).

[104] *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013).

[105] *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 557; ROA.10792; *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 504; ROA.10661; *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 434; ROA.10723.

[106] *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019).

[107] *Ostrewich v. Tatum*, 72 F.4th 94, 100 (5th Cir. 2023) (quoting *City of Austin,* 943 F.3d at 997).

No. 22-50775
c/w Nos. 22-50777, 22-50778

officials have 'some connection with the enforcement of the challenged act.'"[108]  We conduct this analysis "provision-by-provision."[109]

The required "connection," our circuit has recognized, can be difficult to articulate.[110]  Regardless, we have identified three "guideposts" that aid our analysis.[111]  A state official enforces a challenged provision if:

> (1) the state official has "more than the general duty to see that the laws of the state are implemented," *i.e.*, a "particular duty to enforce the statute in question"; (2) the state official has "a demonstrated willingness to exercise that duty"; and (3) the state official, through her conduct, "compel[s] or constrain[s persons] to obey the challenged law."[112]

"To determine whether an official has demonstrated a willingness to enforce a challenged statute, we consider the prior or contemporaneous affirmative acts of the named official."[113]

The *Ex parte Young* defendant needs only "*some connection* with enforcement" of these challenged provisions for the *Ex parte Young*

---

[108] *Id.* (quoting *City of Austin*, 943 F.3d at 997).

[109] *Mi Familia Vota v. Ogg*, 105 F.4th 313, 327 (5th Cir. 2024) (quoting *Tex. All. for Retired Ams. v. Scott* (*TARA*), 28 F.4th 669, 672 (5th Cir. 2022)); *see also id.* at 328 n.10 (noting there is no need to "evaluate the terms of each challenged S.B. 1 provision" where the "purported enforcement connection is the same for all S.B. 1 provisions").

[110] *See, e.g.*, *Tex. Democratic Party v. Abbott* (*TDP*), 978 F.3d 168, 179 (5th Cir. 2020) ("This circuit has not spoken with conviction about all relevant details of the 'connection' requirement.").

[111] *Ogg*, 105 F.4th at 325 (quoting *TARA*, 28 F.4th at 672).

[112] *Id.* (alterations in original) (quoting *TARA*, 28 F.4th at 672).

[113] *Id.* at 330.

exception to sovereign immunity to apply.[114] We have clarified that "[t]he text of the challenged law need not actually state the official's duty to enforce it."[115] Enforcement goes beyond the "type of direct enforcement . . . where the attorney general threaten[s] civil and criminal prosecution."[116] All that is needed is a "scintilla of 'enforcement' by the relevant state official with respect to the challenged law."[117]

## A

The district court concluded that the Secretary's connection to the enforcement of thirty-seven provisions of S.B.1 was sufficient to overcome her sovereign immunity.[118] We analyze these provisions in turn, grouping similar provisions where appropriate. We focus on the Secretary's specific duties and actions because "[t]he Secretary's general duties 'fail to make [her] the enforcer of specific election code provisions.'"[119]

## 1

The first issue is whether sovereign immunity bars plaintiffs' challenges against S.B.1 §§ 2.05, 2.06, and 2.07, which operationalize the

---

[114] *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (emphasis added) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

[115] *Id.* at 998 (citing *Young*, 209 U.S. at 157).

[116] *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017).

[117] *TDP*, 978 F.3d 168, 179 (5th Cir. 2020) (quoting *City of Austin*, 943 F.3d at 1002).

[118] *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 504, 557 (W.D. Tex. 2022); ROA.10792 (LUPE); *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 449, 504 (W.D. Tex. 2022); ROA.10661 (MFV); *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 434 (W.D. Tex. 2022); ROA.10723 (OCA).

[119] *Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022) (quoting *TARA*, 28 F.4th 669, 674 (5th Cir. 2022)).

No. 22-50775
c/w Nos. 22-50777, 22-50778

Secretary's duty to sanction voter registrars who fail to comply with the rules and provisions on updating voter registration lists. Section 2.05 requires the Secretary to "enter into an agreement with the Department of Public Safety" to compare information in the "statewide computerized voter registration list" to information in the "database of the Department of Public Safety."[120] Section 2.07 requires the Secretary to make quarterly comparisons of these lists and notify the voter registrar if a voter is "not a citizen or a resident of the county in which the voter is registered to vote."[121]  In turn, § 2.06 imposes on the Secretary a duty to sanction a voter registrar that is not in "substantial compliance" with the provisions of the Texas Election Code that address the statewide computerized voter-registration list.[122]  These sanctions include requiring the voter registrar to attend a training course, auditing the voter registration list for the county in which the registrar serves, and "inform[ing] the attorney general" that the county which the registrar serves "may be subject to a civil penalty."[123]

"To be amenable to suit under [*Young*], the state actor must both possess 'the authority to enforce the challenged law' and have a 'sufficient connection [to] the enforcement of the challenged act.'"[124]  The Secretary meets these requirements for §§ 2.05, 2.06, and 2.07 because they "specially

---

[120] S.B.1 § 2.05 (codified at Tex. Elec. Code § 16.0332).

[121] *Id.* § 2.07 (codified at Tex. Elec. Code § 18.068).

[122] *Id.* § 2.06 (codified at Tex. Elec. Code § 18.065).

[123] *Id.*

[124] *Haverkamp v. Linthicum*, 6 F.4th 662, 670 (5th Cir. 2021) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019)).

No. 22-50775
c/w Nos. 22-50777, 22-50778

charge[] [the Secretary] with the duty to enforce" the particular provisions.[125]

Among other details, § 2.05, codified in Texas Election Code § 16.0332, commands the Secretary to "enter into an agreement with the Department of Public Safety [DPS]" under which voter registration lists are compared with Department databases to verify voter registration information.[126]   The Secretary is directed by § 2.05 to consider only certain information in the DPS database.  If the prescribed comparison reflects that a person is "excused or disqualified from jury service because of citizenship status" or indicates a "lack of citizenship status," the registrar receives notice and is required to notify the voter and to require the voter to "submit to the registrar proof of United States citizenship."[127]   The registrar's duty in this regard is mandatory, not discretionary.  Accordingly, as the plaintiffs allege, the Secretary's role in the process of purging voter registration rolls is direct.

The Secretary is directed under § 2.06 to monitor registrars' compliance with certain state laws regarding voter registration.  That section requires the Secretary to impose escalating penalties on non-compliant voter registrars.[128]   Section 2.06 also provides that "[t]he secretary of state shall develop and implement a training course for registrars on substantial compliance" with certain election code provisions.[129]   This section also provides that the Secretary is responsible for conducting an audit that can be

---

[125] *Ex parte Young*, 209 U.S. 123, 158 (1908).

[126] S.B.1 § 2.05 (codified at Tex. Elec. Code § 16.0332).

[127] Tex. Elec. Code § 16.0332(a).

[128] S.B.1 § 2.06 (codified at Tex. Elec. Code § 18.065).

[129] *Id.*

No. 22-50775
c/w Nos. 22-50777, 22-50778

used as the basis for imposing civil penalties against a county that does not comply. The plaintiffs assert, and we agree, that "[w]ere the Secretary not empowered to enforce the law in these ways, voter registrars' ability to identify and ensure compliance with some of S.B. 1's . . . provisions would be severely circumscribed." The Secretary's enforcement powers are directly traceable to registrars' compliance with the state's laws.

Section 2.07 provides that the "secretary of state shall quarterly compare the information received" from lists of deaths, noncitizens, and nonresidents "to the statewide computerized voter registration list" and send notices to voter registrars if registered voters are deceased, noncitizens, or nonresidents.[130] Nothing in the state laws permits a registrar to ignore a notice that a person is a noncitizen or no longer a resident of the county in which they are registered to vote. A registrar may fail in its obligations, but the registrar is nonetheless under an obligation under state law to remove a person from the registration list if notified. The Secretary plays the central role under state law of notifying registrars of those whose names should be removed from voter registration lists. Because the "specific duty" of the Secretary "to take enforcement action [is] clear" in each provision, the Secretary is a proper *Ex parte Young* defendant for §§ 2.05, 2.06, and 2.07.[131]

The Secretary also has demonstrated a willingness to enforce §§ 2.05, 2.06, and 2.07. While a "[a] history of prior enforcement is not required," "'some scintilla' of affirmative action by the state official" is needed to show a willingness to enforce.[132] As recited in the amended complaint, Secretary

---

[130] *Id.* § 2.07 (codified at Tex. Elec. Code § 18.068).

[131] *Mi Familia Vota v. Ogg*, 105 F.4th 313, 328 (5th Cir. 2024).

[132] *Id.* at 329 (quoting *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020)).

Nelson's predecessor announced that his office "ha[d] already begun" a "full forensic audit" of the 2020 election, including "identify[ing] potential non-U.S. citizen voters," and directing the voter registrars to "to take action to verify the eligibility of registered voters."[133] This indicates that the Secretary is willing to take action to audit and verify voter registration lists and direct registrars to remedy any errors.

Accordingly, plaintiffs' § 1983 claims against the Secretary that challenge S.B.1. §§ 2.05, 2.06, 2.07 are not barred by sovereign immunity.

**2**

We consider whether the Secretary's (1) duty to design early voting and mail-in-ballot applications and (2) duty to design rosters to record information from voter-assistors constitutes sufficient enforcement of any of the challenged S.B.1 provisions.

Sections 5.01, 5.02, 5.03, 5.08, 5.10, and 5.13 create new requirements for early voting and mail-in ballots. Section 5.01 requires that mail-in-ballot applications have a wet signature.[134] Section 5.02 requires early-voting-ballot applications include details of a government-issued identification card, such as the number of a driver's license or the last four digits of a social security number.[135] Sections 5.03 and 5.08 specify that the official ballot application forms and carrier envelopes must include spaces for this information.[136] Section 5.10 helps operationalize these requirements by instructing the Secretary that he "shall develop or otherwise provide an online tool" to

---

[133] ROA.6629 (cleaned up).

[134] S.B.1 § 5.01 (codified at Tex. Elec. Code § 84.001(b)).

[135] *Id.* § 5.02 (codified at Tex. Elec. Code § 84.002(1-a)).

[136] *Id.* §§ 5.03, 5.08 (codified at Tex. Elec. Code §§ 84.011(a), 86.002).

No. 22-50775
c/w Nos. 22-50777, 22-50778

"allow a voter to add or correct" the newly required information.[137]  Finally, § 5.13 clarifies that a ballot may only be accepted if the ballot satisfies the new requirements.[138]

Sections 4.12, 6.01, 6.03, 6.05, and 6.07 create new obligations for people delivering ballots or assisting voters.  Section 4.12 requires "an election official" who receives an "in-person delivery of a marked ballot" to "record the voters' name, signature, and type of identification provided . . . on a roster prescribed by the secretary of state."[139]  Similarly, §§ 6.01, 6.03, 6.05, and 6.07 require voter assistors to provide information on a form prescribed by the Secretary.[140]

The Secretary argues that she does not enforce these provisions because enjoining her from prescribing the design and content of the vote-by-mail applications, mail-in-ballot carrier envelopes, or voter-assistance forms "would not afford the Plaintiffs the relief that they seek."  Such an injunction, she argues, would not relieve local officials of their obligation to reject applications that do not comply with the new requirements.

Our decision in *Texas Democratic Party v. Abbot* (*TDP*)[141] guides our analysis of these provisions and dictates otherwise.  In that case, we held the Secretary's "duty to design the application form for mail-in ballots" constituted enforcement of an age requirement for early voting by mail.[142]

---

[137] *Id.* § 5.10 (codified at TEX. ELEC. CODE § 86.015(c)(4)).

[138] *Id.* § 5.13 (codified at TEX. ELEC. CODE § 87.041).

[139] *Id.* § 4.12 (codified at TEX. ELEC. CODE § 86.006(a-2)).

[140] *Id.* §§ 6.01, 6.03, 6.05, 6.07 (codified at TEX. ELEC. CODE §§ 64.009, 64.031, 86.010, 86.013(b)).

[141] 978 F.3d 168 (5th Cir. 2020).

[142] *Id.* at 179-80.

No. 22-50775
c/w Nos. 22-50777, 22-50778

We reasoned that "[b]ecause local authorities are required to use the Secretary's absentee-ballot form outside of emergency situations, . . . the Secretary has the authority to compel or constrain local officials based on actions she takes as to the application form."[143]

We rejected an argument similar to the Secretary's here. Critically, we recognized in *TDP* that "some duties" pertaining to mail-in and early voting "f[ell] on other officials."[144] For instance, we noted that a "local early voting clerk shall review each application for a ballot to be voted by mail" and the "early voting clerk shall mail without charge an appropriate official application form."[145] But regardless of the "division of responsibilities," we held "the Secretary ha[d] the needed connection."[146]

Following this principle, we conclude that the Secretary enforces the provisions of S.B.1 that create new requirements for early voting and voting by mail. While S.B.1's requirements may be different, our logic in *TDP* applies with full force. Sections 5.03 and 5.08 instruct the Secretary to amend the official forms and carrier envelopes to include spaces for the signature and identification information.[147] Local authorities are required to use the official forms except in an emergency.[148] Accordingly, "the Secretary has the

---

[143] *Id.* at 180.

[144] *Id.*

[145] *Id.* (internal quotation marks omitted) (first quoting Tex. Elec. Code § 86.001(a); and then quoting *id.* § 84.012).

[146] *Id.*; *cf. Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("[T]he ability 'to effectuate a partial remedy' satisfies the redressability requirement." (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992))).

[147] S.B.1 §§ 5.03, 5.08 (codified at Tex. Elec. Code §§ 84.011(a), 86.002).

[148] *See* Tex. Elec. Code § 31.002(d) ("An authority having administrative duties under this code shall use an official form in performing the administrative functions . . . .").

No. 22-50775
c/w Nos. 22-50777, 22-50778

authority to compel or constrain local officials" to enforce the requirements of S.B.1 "based on actions she takes as to the application form."[149]

The same logic applies to §§ 4.12, 6.01, 6.03, 6.05, and 6.07 even though they address voter-assistance and ballot-delivery forms. The Secretary prescribes the forms that local officials must provide, and the recipients of the forms are expected to fill them out.[150] Accordingly, for these forms, too, "the Secretary has the authority to compel or constrain local officials" to enforce the requirements of S.B.1 "based on actions she takes."[151]

The Secretary's reliance on our decision in *Lewis v. Scott*[152] is not persuasive. In *Lewis*, we held that the Secretary did not have the necessary connection to several provisions of the Texas Election Code to overcome her sovereign immunity.[153] The plaintiffs challenged four provisions in that case: two provisions that required voters to pay for postage to mail a ballot and postmark mailed ballots; a provision that required a committee to verify voter's signatures on carrier envelopes; and a provision that criminalized knowingly possessing another person's mail-in ballot or carrier envelope

---

[149] *TDP*, 978 F.3d at 180.

[150] *See, e.g.*, S.B.1 § 4.12 (codified at Tex. Elec. Code § 86.006(a-2)) ("An in-person delivery of a marked ballot voted under this chapter must be received by an election official at the time of delivery. The receiving official shall record the voter's name, signature, and type of identification . . . on a roster prescribed by the secretary of state."); *id.* § 6.01 (codified at Tex. Elec. Code § 64.009(f), (h) (amended 2023)) ("'(f) A person who simultaneously assists seven or more voters voting under this section by providing the voters with transportation to the polling place must complete and sign a form, provided by an election officer . . . (h) The secretary of state shall prescribe the form described by Subsection (f).").

[151] *TDP*, 978 F.3d at 180.

[152] 28 F.4th 659 (5th Cir. 2022).

[153] *Id.* at 664.

No. 22-50775
c/w Nos. 22-50777, 22-50778

except in specific circumstances.[154] We noted that "[t]he early voting clerk," "the clerk," and "local election officials" were tasked with overseeing these requirements.[155] In light of this, we stated that "[w]here a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends."[156] However, we also noted that the Secretary's authority to "prescribe instructions to be printed on the balloting materials for the execution and return of a statement of residence . . . ha[d] nothing to do with enforcing" these provisions.[157] Indeed, none of those provisions involved recording information on forms that local officials were required to provide, so the Secretary's authority to prescribe forms was inapposite. There were no actions the Secretary could have taken with respect to the forms that would compel or constrain compliance with the challenged provisions.

The same cannot be said about the challenged S.B.1 provisions, which require local officials to provide the forms prescribed by the Secretary and expect the form recipients to fill them out. Unlike the Secretary's role regarding the challenged provisions in *Lewis*, "the Secretary has the authority to compel or constrain local officials" to enforce the requirements of S.B.1 "based on actions she takes as to the [] form[s]."[158] As a result, we hold the Secretary has the requisite connection to enforcement to overcome her sovereign immunity for plaintiffs' challenges to §§ 4.12, 5.01, 5.02, 5.03, 5.08, 5.10, 5.13, 6.01, 6.03, 6.05, and 6.07.

---

[154] *Id.* at 662.

[155] *Id.* at 663 (alteration in original).

[156] *Id.* (quoting *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019)).

[157] *Id.* (quoting Tex. Elec. Code § 86.002(d)).

[158] *TDP*, 978 F.3d 168, 180 (5th Cir. 2020).

No. 22-50775
c/w Nos. 22-50777, 22-50778

**3**

We next consider whether the Secretary's authority to refer violations of the Texas Election Code for prosecution, either civilly or criminally, constitutes sufficient enforcement of S.B.1 §§ 2.04, 2.08, 4.01, 4.06, 4.07, 4.09, 5.04, 6.06, 7.02, 7.04, and 8.01. There are two sources of the Secretary's referral authority. First, under S.B.1 § 2.08, the Secretary "shall" refer information indicating criminal conduct to the Attorney General after she makes her own "determin[ation] that there is reasonable cause to suspect that criminal conduct occurred."[159] Second, under § 34.005(a) of the Texas Election Code, "[t]he secretary of state may refer a reported violation of law for appropriate action to the attorney general, if the attorney general has jurisdiction, or to a prosecuting attorney having jurisdiction."[160] The S.B.1 provisions discussed in this section work in tandem with the Secretary's authority to refer violations of the Texas Election Code.

Sections 2.04, 4.01, 4.06, 4.09, 5.04, 6.06, 7.02, and 7.04 (the substantive provisions) describe conduct that violates the Texas Election Code. Sections 4.06, 4.09, 6.06, 7.02, and 7.04 either alter existing, or establish new, Texas Election Code offenses.[161] Sections 4.01 and 4.07 place limits on a presiding judge's ability to have an election watcher removed, which, if violated, becomes an election offense under § 4.09.[162] Similarly, § 2.04 requires voter registrars to send a notice to the Attorney General and

---

[159] S.B.1 § 2.08 (codified at Tex. Elec. Code § 31.006).

[160] Tex. Elec. Code § 34.005(a).

[161] S.B.1 §§ 4.06, 4.09, 6.06, 7.02, 7.04 (codified at Tex. Elec. Code §§ 33.051(g), 33.061(a), 86.0105, 276.004, 276.015).

[162] *Id.* §§ 4.01, 4.07, 4.09 (codified at Tex. Elec. Code §§ 32.075, 33.056, 33.061(a)).

Secretary if they "determine[] that a person who is not eligible to vote registered to vote or voted in an election."[163]    Section 5.04 prohibits "officer[s] or employee[s] of this state or of a political subdivision" from either distributing early ballot applications to voters that do not request them or spending public funds to facilitate another's distribution of early ballot applications to voters that do not request them.[164] If a voter registrar violates § 2.04 or § 5.04, they may be civilly liable under § 8.01.[165]

Sections 2.08 and 8.01 add color to the Secretary's authority to refer violations of the Texas Election Code.    Section 2.08 provides that the Secretary "shall promptly refer" and "deliver to the attorney general all pertinent documents and information" if the Secretary has discovered or has "reasonable cause to suspect" election crimes have occurred.[166] Section 8.01 establishes civil liability for voter registrars if they "violate[] a provision of the code."[167]

The Secretary argues that referring pertinent information and documents about discovered or suspected violations of law to the Attorney General or a local prosecutor does not compel or constrain anyone to obey the challenged law—only an enforcement action would have that compulsive effect, and the Secretary is not empowered to institute criminal or civil prosecutions under these statutes.    In the Secretary's view, the district or county attorneys with prosecuting authority are the only enforcers of these provisions.    We do not adopt the Secretary's positions, but we agree that the

---

[163] *Id.* § 2.04 (codified at Tᴇx. Eʟᴇᴄ. Cᴏᴅᴇ § 15.028).

[164] *Id.* § 5.04 (codified at Tᴇx. Eʟᴇᴄ. Cᴏᴅᴇ § 84.0111).

[165] *Id.* § 8.01 (codified at Tᴇx. Eʟᴇᴄ. Cᴏᴅᴇ § 31.129(b)(2)).

[166] *Id.* § 2.08 (codified at Tᴇx. Eʟᴇᴄ. Cᴏᴅᴇ § 31.006).

[167] *Id.* § 8.01 (codified at Tᴇx. Eʟᴇᴄ. Cᴏᴅᴇ § 31.129(b)(2)).

No. 22-50775
c/w Nos. 22-50777, 22-50778

Secretary does not enforce §§ 2.04, 2.08, 4.01, 4.06, 4.07, 4.09, 5.04, 6.06, 7.02, 7.04, and 8.01.

Our recent cases counsel that the Secretary does not enforce either the substantive provisions or §§ 2.08 and 8.01.  Starting with §§ 2.08 and 8.01, the Secretary cannot be the enforcer of these provisions because the Secretary's conduct in referring information about potential or actual civil or criminal violations under these statutes is too attenuated from any concrete enforcement actions to constitute even a scintilla of enforcement.

Section 2.08 requires the Secretary to report suspected criminal conduct to the Attorney General.[168]  At first, this duty appears to provide the "scintilla of enforcement" necessary for *Ex parte Young* to apply.[169]  Indeed, the district court reasoned that "[t]here can be no clearer example of compulsion or constraint and therefore enforcement" than requiring the Secretary to submit individuals "[s]he believes have engaged in election law offenses, to prosecution" or to impose sanctions on voter registrars whom "in h[er] estimation, have not complied with h[er] rules and requirements."[170]  Additionally, the Secretary has "demonstrated a willingness"[171] to refer suspected criminal conduct to the Attorney General because the complaint alleges that the Secretary referred an estimated forty

---

[168] S.B.1 § 2.08 (codified at Tᴇx. Eʟᴇᴄ. Cᴏᴅᴇ § 31.006).

[169] *TDP*, 978 F.3d 168, 179 (5th Cir. 2020) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019)).

[170] *See La Unión del Pueblo Entero v. Abbott,* 618 F. Supp. 3d 504, 523 (W.D. Tex. 2022); ROA.10735 n.7 (emphasis added).

[171] *Mi Familia Vota v. Ogg*, 105 F.4th 313, 330 (5th Cir. 2024).

No. 22-50775
c/w Nos. 22-50777, 22-50778

cases to the Attorney General following the 2020 election[172] and plans to continue to do so in the future.[173]

But these arguments overlook an important detail. Under the Texas Constitution, the "Attorney General has no independent authority to prosecute election-related criminal offenses."[174] For this exact reason, we held that the Attorney General "does not have the ability to 'compel or constrain local officials' to enforce the electioneering laws."[175] It would be illogical to conclude that the Secretary enforces either § 2.08 or the substantive provisions by referring criminal conduct to an official who *cannot* independently enforce these provisions. The same is true of § 8.01. As we explain below,[176] the Attorney General does not enforce § 8.01 for *Ex parte Young* purposes, so none of the Secretary's conduct *vis-à-vis* the Attorney General enforces § 8.01 either.

Accordingly, the Secretary does not enforce S.B.1 §§ 2.08 and 8.01, nor do those provisions provide a connection between the Secretary and enforcement of the substantive provisions. The Secretary does not otherwise "have the requisite connection" to the enforcement of the substantive provisions because the Secretary does not have a "specific and relevant

---

[172] ROA.5866.

[173] ROA.5867 ("More recently, the Texas legislature approved $4 million dollars for the creation of an Election Audit Division in the SOS's office, and the SOS stated that it will use the division to 'ensure any cases of illegal voting or election crimes are investigated by the proper law enforcement authorities, including the Texas Attorney General's Office.'").

[174] *Ostrewich v. Tatum*, 72 F.4th 94, 101 (5th Cir. 2023) (citing *State v. Stephens*, 663 S.W.3d 45, 47 (Tex. Crim. App. 2021), *reh'g denied*, 664 S.W.3d 293 (Tex. Crim. App. 2022)), *cert. denied*, 144 S. Ct. 570 (2024).

[175] *Id.* (citing *City of Austin v. Paxton*, 943 F.3d 993, 1001 (5th Cir. 2019)).

[176] *See infra* Part III.B.2.

No. 22-50775
c/w Nos. 22-50777, 22-50778

duty" with respect to any of them.[177]  The substantive provisions themselves do not regulate the Secretary or compel her to act.  Instead, they affect other public officials.  As we have explained, "[w]here a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends."[178]  Section 4.01 restricts the ability of presiding judges to remove watchers,[179] and § 4.06 describes the process by which presiding judges and clerks verify a watcher's paper work.[180]  Sections 4.06 and 4.09 define new election offenses relating to obstructing watchers.[181]  Sections 6.06, 7.02, and 7.04 similarly define election offenses unrelated to the Secretary.[182]  Section 5.04 regulates all "officer[s] or employee[s] of this state or of a political subdivision of this state" with respect to distribution of early voting applications.[183]  Section 2.04 does mention the Secretary, as it requires voter registrars to send a notice to the Attorney General and the Secretary if they "determine[] that a person who is not eligible to vote registered to vote or voted in an election."[184]  But the Secretary's receipt of information is not "enforcement" in any meaningful sense.  If, as we held in *Mi Familia Vota v.*

---

[177] *TDP*, 978 F.3d 168, 179 (5th Cir. 2020).

[178] *City of Austin*, 943 F.3d at 998.

[179] S.B.1 § 4.01 (codified at Tex. Elec. Code § 32.075).

[180] *Id.* § 4.06 (codified at Tex. Elec. Code § 33.051(b)-(e)).

[181] *Id.* §§ 4.06, 4.09 (codified at Tex. Elec. Code §§ 33.051(g), 33.061(a)).

[182] *Id.* §§ 6.06, 7.02, 7.04 (codified at Tex. Elec. Code §§ 33.051(g), 33.061(a), 86.0105, 276.004, 276.015).

[183] *Id.* § 5.04 (codified at Tex. Elec. Code § 84.0111); *see also Tex. Democratic Party v. Hughs*, 997 F.3d 288, 291 (5th Cir. 2021) (noting that "by statute, a local official (typically the county clerk or city secretary) serves as the 'early voting clerk' responsible for conducting the early voting in each election").

[184] S.B.1 § 2.04 (codified at Tex. Elec. Code § 15.028)).

No. 22-50775
c/w Nos. 22-50777, 22-50778

*Ogg*,[185] a district attorney's "ability to *investigate* election code violations . . . does not rise to the level of compulsion or constraint needed,"[186] then neither does *receiving* information about election code violations.

Texas Election Code § 34.005(a) also does not provide the "requisite connection"[187] to the substantive provisions.    Under § 34.005(a), the Secretary "*may* refer a reported violation of law for appropriate action to the attorney general, if the attorney general has jurisdiction, or to a prosecuting attorney having jurisdiction."[188]    Under *Ogg*, "[d]iscretionary authority to act, on its own, is insufficient to give rise to a particular duty to act, *i.e.*, a 'sufficient connection [to] enforcement.'"[189]

In *Ogg*, we held that the Harris County District Attorney was "not a proper defendant under *Ex parte Young*" when challenging S.B.1.[190]    We reasoned that there was "no statute that *command[ed]* [Harris County District Attorney] Ogg to prosecute Texas Election Code violations.    Instead, Ogg's authority to bring criminal prosecutions on behalf of the State [was] derived from the Texas constitution . . . and from the Texas Code of Criminal Procedure."[191]    We further held in *Ogg* that the plaintiffs were required, but had failed, to show that the district attorney had "demonstrated

---

[185] 105 F.4th 313 (5th Cir. 2024).

[186] *Id.* at 332.

[187] *TDP*, 978 F.3d 168, 179 (5th Cir. 2020).

[188] Tex. Elec. Code § 34.005(a) (emphasis added).

[189] *Ogg*, 105 F.4th at 327 (second alteration in original) (quoting *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019)).

[190] *Id.* at 333.

[191] *Id.* at 328 (emphasis added).

No. 22-50775
c/w Nos. 22-50777, 22-50778

a willingness to enforce"[192] the statutes at issue, and we held that the plaintiffs were not compelled or constrained by the statutes at issue because the district attorney had "neither enforced the challenged statute against anyone nor threatened to do so."[193]  There was "no such clarity" that it was Ogg's "specific duty" to enforce S.B.1.[194]  In the present case, Texas Election Code § 34.005(a) does not *command* the Secretary to refer violations of law.  "The statute says 'may.'  And 'may' does not just suggest discretion, it *clearly* connotes it."[195]  In any event, the referral of information regarding a potential or actual violation of the statutes at issue to a prosecuting attorney does not effectuate a prosecution.  The prosecuting attorney would decide whether to prosecute.

This court's decision in *Ostrewich v. Tatum*[196] further supports our conclusion that the Secretary does not enforce the substantive provisions.  In *Ostrewich*, we held that the Secretary was not stripped of sovereign immunity under *Ex parte Young* when plaintiffs challenged three Texas Election Code provisions that prohibit electioneering near polling places.[197]  We explained that the Secretary's responsibility both for "training presiding judges to enforce elections law," and for "issu[ing] election advisories interpreting the electioneering laws, which guide presiding judges' discretionary decisions," fell "short of the showing required for her to face suit under *Young*."[198]  More

---

[192] *Id*. at 331.

[193] *Id*. at 332.

[194] *Id.* at 328.

[195] *United States v. Abbott*, 85 F.4th 328, 337 (5th Cir. 2023) (quoting *Biden v. Texas*, 597 U.S. 785, 802 (2022)).

[196] 72 F.4th 94 (5th Cir. 2023).

[197] *Id*. at 100-01.

[198] *Id*. at 100.

No. 22-50775
c/w Nos. 22-50777, 22-50778

importantly, we explained that "presiding judges are exclusively entrusted with enforcing the electioneering laws at polling locations," and they have "absolute discretion in exercising that enforcement power."[199] We therefore concluded that the Secretary "does not directly enforce the electioneering laws, but only provides interpretive guidance."[200]

As with the presiding judges in *Ostrewich*, the prosecuting attorneys, not the Secretary of State, have the "absolute discretion" to file charges to enforce S.B.1's substantive provisions.[201] The Secretary "does not directly enforce" the criminal or civil provisions, and the information the Secretary refers to the attorneys who do is akin to the advisories and guidance the Secretary provides to presiding judges.[202]

In light of our precedents, we cannot say that §§ 2.04, 2.08, 4.01, 4.06, 4.07, 4.09, 5.04, 6.06, 7.02, 7.04, and 8.01 are "enforced" by the Secretary.[203] Accordingly, plaintiffs' § 1983 claims against the Secretary that challenge S.B.1 §§ 2.04, 2.08, 4.01, 4.06, 4.07, 4.09, 5.04, 6.06, 7.02, 7.04, and 8.01 are barred by sovereign immunity.

**4**

Next, we address §§ 5.06, 5.07, 5.11, 5.12, 5.14, and 6.04, which deal with the process of *accepting* mail-in-ballot and early voting applications.

Section 5.06 permits election judges to allow persons who requested and were sent an early voting ballot, but who then cancel their early voting

---

[199] *Id.* at 100-01.

[200] *Id.* at 101.

[201] *See id.*

[202] *Id.* at 100-01

[203] *See Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017).

applications and fail to return their early voting ballots, to vote using only provisional ballots.[204] Section 5.07 instructs the early voting clerk to reject applications for mail-in ballots and provide notice if the application "does not identify the same voter identified on the applicant's application for voter registration."[205] Section 5.11 modifies the eligibility requirements to serve on a signature verification committee and the manner in which signature verification committees are constituted.[206] Sections 5.12 and 5.14 describe the circumstances and methods in which a voter can correct defects identified by the signature verification committee and the early voting ballot board.[207] Section 6.04 amends the oath that an election officer "at the polling place" must provide to a person assisting another voter.[208]

In *Richardson v. Flores*,[209] we held that the Secretary did not enforce the "ballot verification system," which included activities such as the "process of verifying signatures on mail-in ballots." We distinguished *TDP* by recognizing that in *TDP*, "we held the Secretary enforced a challenged age restriction on mail-in voting, because she created the mail-in application form that local officials had to use. [But h]ere, Plaintiffs challenge not the mail-in forms but how local officials verify the signatures on those forms."[210]

The same holds true in this case. Here, the "clerk" is tasked with verifying the information on the mail-in ballot application matches the

---

[204] S.B.1 § 5.06 (codified at Tex. Elec. Code § 84.035(b)).

[205] *Id.* § 5.07 (codified at Tex. Elec. Code § 86.001).

[206] *Id.* § 5.11 (codified at Tex. Elec. Code § 87.027).

[207] *Id.* §§ 5.12, 5.14 (codified at Tex. Elec. Code §§ 87.0271, 87.0411).

[208] *Id.* § 6.04 (codified at Tex. Elec. Code § 64.034).

[209] 28 F.4th 649, 653-54 (5th Cir. 2022).

[210] *Id.* at 654 n.9 (internal citation omitted).

applicant's voter registration information.[211] The "county election board," "the county chair," and "the governing body of the political subdivision" are the authorities "responsible for appointing the members of a signature verification committee."[212] The "signature verification committee" and the "early voting ballot board" "determine if it would be possible for the voter to correct the defect and return the carrier envelope before the time the polls are required to close on election day."[213] The "election judge" makes the decision to allow for a provisional ballot.[214] At bottom, the provisions deal with the ballot-verification process, specify which officials are tasked with enforcing them, and require those officials to exercise discretion (e.g., determining when a ballot signature matches an applicant's signature).[215] In

---

[211] S.B.1 § 5.07 (codified at Tex. Elec. Code § 86.001).

[212] Tex. Elec. Code § 87.027(b); *see* S.B.1 § 5.11 (codified at Tex. Elec. Code § 87.027(d)) ("The authority shall appoint as vice chair of the committee the highest-ranked person on the list provided by the political party whose nominee for governor received the second most votes in the county in the most recent gubernatorial general election.").

[213] S.B.1 § 5.12 (codified at Tex. Elec. Code § 87.0271 (amended 2023)) ("signature verification committee"); *id.* § 5.14 (codified at Tex. Elec. Code § 87.0411 (amended 2023)) ("early voting ballot board"). The 2023 amendments—enacted after the district court's decision—adjust the procedures prescribed for the signature verification committee and early voting ballot board. *See, e.g.,* Tex. Elec. Code § 87.0411 ("If the early voting ballot board determines that it would not be possible for the voter to receive the notice of defect within a reasonable time to correct the defect, the board may notify the voter of the defect by telephone or e-mail and inform the voter that the voter may request to have the voter's application to vote by mail canceled in the manner described by Section 84.032, submit a corrective action form developed by the secretary of state under Subsection (c-1) by mail or by common or contract carrier, or come to the early voting clerk's office in person not later than the sixth day after election day to correct the defect.").

[214] *Id.* § 5.06 (codified at Tex. Elec. Code § 84.035(b)).

[215] *See Lewis v. Scott*, 28 F.4th 659, 664 (5th Cir. 2022) ("'[T]he statutes themselves refute any notion that the Secretary enforces them.'" (citing *City of Austin v. Paxton*, 943 F.3d 993, 998 (5th Cir. 2019))).

No. 22-50775
c/w Nos. 22-50777, 22-50778

*Richardson*, we concluded such provisions were not enforced by the Secretary.[216]  Likewise, the Secretary does not enforce §§ 5.06, 5.07, 5.11, 5.12, 5.14, and 6.04.

The plaintiffs' briefing also argues that the Secretary "is willing to enforce" the challenged article five and article six provisions.  We decline to address this argument because it relies on non-record evidence.[217]

The Secretary is immune from plaintiffs' challenges to §§ 5.06, 5.07, 5.11, 5.12, 5.14, and 6.04.

**5**

We turn to §§ 3.04, 3.09, 3.10, 3.12, 3.13, and 3.15, which address early voting sites and ballots.  Section 3.04 prohibits early voting "from inside a motor vehicle" unless the voter is unable to enter the polling place.[218]  Sections 3.09 and 3.10 adopt new procedures for early voting.[219]  Sections 3.12 and 3.13 require that polling places be located inside physical buildings and prohibit polling places from being within "movable structure[s]."[220]  Finally, § 3.15 prohibits single-choice straight-ticket voting.[221]

We have previously determined that the Secretary does not enforce provisions relating to early voting sites.  In *Mi Familia Vota v. Abbott*,[222] we held the Secretary "has no connection to the enforcement of" a provision of

---

[216] *Richardson v. Flores*, 28 F.4th 649, 653-54 (5th Cir. 2022).

[217] *See* MFV Br. at 40-41 (citing to Secretary of State Election Advisories, some of which postdate the district court's order); OCA Br. at 39.

[218] S.B.1 § 3.04 (codified at Tex. Elec. Code § 43.031(b)).

[219] *Id.* §§ 3.09, 3.10 (codified at Tex. Elec. Code §§ 85.005, 86.006(e)).

[220] *Id.* §§ 3.12, 3.13 (codified at Tex. Elec. Code §§ 85.061(a), 85.062).

[221] *Id.* § 3.15 (codified at Tex. Elec. Code § 124.002(c)).

[222] 977 F.3d 461 (5th Cir. 2020).

No. 22-50775
c/w Nos. 22-50777, 22-50778

the Texas Election Code "concerning the number and location of polling places during early voting."[223]   In *Texas Democratic Party v. Hughs*,[224] we concluded that the Secretary did not have the requisite enforcement connection to a provision banning "mobile or pop-up early voting sites."[225] In both cases, we relied on the fact that "local officials are responsible for administering" early voting.[226]

We have also concluded that the Secretary does not enforce ballot requirements.  In *Mi Familia Vota*, we held the Secretary was not "a proper defendant" for a challenge to a "prohibition of the use of paper ballots" because the "responsib[ility] for printing or distributing ballots . . . falls on local officials."[227]  Similarly, in *Texas Alliance for Retired Americans v. Scott*[228] (*TARA*), we held that the Secretary's authority to "adopt rules and establish procedures as necessary for the [State's] implementation" of HB 25, which eliminated straight-ticket voting, did not make "the Secretary the 'enforcer' of HB 25"[229]—"enforcement of HB 25 f[ell] to local election officials."[230]

These cases are dispositive of the challenges to §§ 3.04, 3.09, 3.10, 3.12, 3.13, and 3.15.  Local election officials are clearly tasked with enforcing

---

[223] *Id.* at 465-68.

[224] 997 F.3d 288 (5th Cir. 2021)

[225] *Id.* at 290-91 (first citing Tex. Elec. Code §§ 83.001, 83.002, 83.005; and then citing *id.* § 85.062(a)).

[226] *Id.* at 291 (citing *Mi Familia Vota*, 977 F.3d at 468).

[227] *Mi Familia Vota*, 977 F.3d at 468 (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020)), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021)).

[228] 28 F.4th 669 (5th Cir. 2022).

[229] *Id.* at 673.

[230] *Id.* at 672-73.

No. 22-50775
c/w Nos. 22-50777, 22-50778

the provisions relating to early voting sites and the printing of ballots.[231]  The district court came to the opposite conclusion by relying on the Secretary's authority to "adopt rules . . . to assist the presiding judge of a polling place in processing forms and conducting procedures required by [the Election Code] at the opening and closing of the polling place."[232]  But as in *TARA*, the authority to "adopt rules and establish procedures" is not the ability to enforce.[233]  Accordingly, the Secretary is not the proper defendant for plaintiffs' challenges to these provisions.

\*     \*     \*

In conclusion, we reverse the district court's determination that the Secretary is not entitled to sovereign immunity with respect to plaintiffs' § 1983 claims challenging §§ 2.04, 2.08, 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 5.04, 5.06, 5.07, 5.11, 5.12, 5.14, 6.04, 6.06, 7.02, 7.04, and 8.01.  We affirm the district court's conclusion that sovereign immunity does not bar the plaintiffs' § 1983 claims against the Secretary with respect to

---

[231] *See Mi Familia Vota*, 977 F.3d at 468 ("The Secretary is not responsible for printing or distributing ballots.  That responsibility falls on local officials." (footnote omitted) (citing Tex. Elec. Code §§ 52.002, 31.043)); *In re Cercone*, 323 S.W.3d 293, 294 (Tex. App.—Dallas 2010, no pet.) (recognizing, in a suit regarding an election in Dallas County, that the "Elections Administrator for Dallas County . . . is responsible for printing and mailing the general election ballots"); *Tex. Democratic Party v. Hughs*, 997 F.3d 288, 291 (5th Cir. 2021) ("Indeed, by statute, a local official . . . serves as the 'early voting clerk' responsible for conducting the early voting in each election." (quoting Tex. Elec. Code §§ 83.001-02, 83.005)).

[232] *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 504, 527 (W.D. Tex. 2022) (quoting Tex. Elec. Code § 66.004); ROA.10743.

[233] *TARA*, 28 F.4th at 673; *cf. Mi Familia Vota v. Abbott*, 977 F.3d at 467 ("[T]he statutory authority . . . to issue, amend or rescind an Executive Order 'is not the power to enforce it.'" (footnote omitted) (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020), *cert. granted, judgment vacated sub nom. Planned Parenthood Ctr. for Choice v. Abbott*, 141 S. Ct. 1261 (2021))).

§§ 2.05, 2.06, 2.07, 4.12, 5.01, 5.02, 5.03, 5.08, 5.10, 5.13, 6.01, 6.03, 6.05, and 6.07.

## B

Next, we address the Attorney General. The plaintiffs challenged thirty-five provisions of S.B.1 in their claims against the Attorney General, and the district court concluded the Attorney General enforced twenty-nine of those provisions.[234] We reverse the district court as to twenty-eight provisions, concluding that the Attorney General is not a proper *Ex parte Young* defendant with respect to those twenty-eight provisions. However, we conclude the Attorney General is a proper *Ex parte Young* defendant with regard to § 2.06.

## 1

Section 2.06 stands apart from the other challenged provisions. It imposes requirements on voter registrars.[235] It imposes *civil* penalties and authorizes the Attorney General to sue to recover those penalties: it expressly states that a county can be "liable to this state for a civil penalty" if a voter registrar for the county fails to comply substantially, and "[t]he attorney general may bring an action to recover a civil penalty imposed under this section."[236] The plaintiffs argue that § 2.06 allows the Attorney General to compel or constrain election officials via civil prosecution. The dissenting opinion counters that "the Attorney General has *zero* connection to the

---

[234] *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 533-39; ROA.10752-61; *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 449, 479-80 (W.D. Tex. 2022); ROA.10620-21; *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 388, 408-14 (W.D. Tex. 2022); ROA.10681-90.

[235] S.B.1 § 2.06 (codified at Tex. Elec. Code § 18.065).

[236] Tex. Elec. Code § 18.065(f).

No. 22-50775
c/w Nos. 22-50777, 22-50778

plaintiffs" because it is "the obligation of voter registrars to reject noncompliant applications, require voters to sign prescribed forms and provide identifying information."[237]   That others also play a part in enforcement does not erase the Attorney General's role in enforcing state laws through the imposition of civil penalties on local officials who refuse to carry out their obligations under state law.[238]

The enforcement of § 2.06 also adversely impacts members of at least one plaintiff.  LUPE alleges that its "members include Latino registered voters, some of whom have limited English proficiency and/or have limited formal schooling and limited literacy,"[239] and "[m]embers of LUPE include individuals who are migrant workers who are registered to vote."[240]

The plaintiffs point to what they consider to be evidence of the Attorney General's demonstrated willingness to enforce S.B.1 via civil and criminal litigation.[241]   The Attorney General contends the plaintiffs have not shown he enforces § 2.06 because the plaintiffs have not sufficiently pleaded he *demonstrated a willingness* to enforce § 2.06.  The Attorney General relies on two cases to support his position—*City of Austin v. Paxton*[242] and *TDP*.

---

[237] *Post* at 71.

[238] *See, e.g.*, *Book People, Inc. v. Wong*, 91 F.4th 318, 335-36 (5th Cir. 2024); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017).

[239] ROA.6648 ¶ 149

[240] ROA.6648 ¶ 160.

[241] *La Unión del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 449, 484 & nn.16-17 (W.D. Tex. 2022) (noting that according to the Attorney General's website, at the time of the district court's order, the Attorney General had brought "510 election offenses against 43 defendants" and had "386 active election fraud investigations"); ROA.10628 (same); *see also* ROA.6615-16 (noting that the Attorney General announced the formation of an "Election Integrity Unit" within his office).

[242] 943 F.3d 993 (5th Cir. 2019).

No. 22-50775
c/w Nos. 22-50777, 22-50778

In *City of Austin*, we held that the City of Austin had not alleged that the Attorney General had a sufficient connection to the enforcement of a statute that "prevent[ed] municipalities and counties from adopting ordinances that restrict[ed] landlords' rights to refuse to rent to voucher program participants."[243]  The City argued that the Attorney General had a "habit of suing or intervening in litigation against the City" that involved municipal ordinances and policies.[244]  We noted, however, that "none of the cases the City cite[d] to demonstrate the Attorney General's 'habit'" were even "remotely related" to the ordinance the City had recently enacted.[245]  We concluded, "the mere fact that the Attorney General has the authority to enforce [the statute] cannot be said to 'constrain' the City from enforcing the Ordinance."[246]

Similarly, we concluded that the plaintiffs in *TDP* failed to allege that the Attorney General had a sufficient connection to the enforcement of Texas Election Code § 82.003, which established an age requirement for voting by mail.[247]  The Attorney General sent a letter to Texas judges and election officials that "ordered public officials to refrain from advising voters who lacked a qualifying condition but nonetheless feared COVID-19 to vote by mail. . . . [and] warned third parties that if they advised voters to vote by mail without a qualifying disability, then the party could be subject to criminal liability under the Texas Election Code."[248]  The plaintiffs "characterize[d]

---

[243] *City of Austin*, 943 F.3d at 996, 999-1000.

[244] *Id.* at 1000.

[245] *Id.* at 1001.

[246] *Id.*

[247] *TDP*, 978 F.3d 168, 175-76, 179, 181 (5th Cir. 2020).

[248] *Id.* at 175.

this guidance as a threat" and relied on it to oppose sovereign immunity.[249] We explained, "our cases do not support the proposition that an official's public statement alone establishes authority to enforce a law, or the likelihood of his doing so, for *Young* purposes."[250] Accordingly, we concluded the letter was not sufficient to establish the Attorney General's connection to the enforcement of the age-based absentee-voting law because: the letter "was sent to judges and election officials, not to the plaintiffs"; it "did not make a specific threat or indicate that enforcement was forthcoming"; and it did not state that the plaintiffs had "violated any specific law."[251]

This case, however, is distinguishable from both *City of Austin* and *TDP*.  Here, the LUPE Plaintiffs point to the Attorney General's October 2021 press release to demonstrate his willingness to enforce § 2.06.  Unlike the cases the plaintiff cited in *City of Austin*, cases which we determined were not "remotely related" to the specific facts of that case,[252] the Attorney General's press release explained his plan to enforce the Election Code, which is significantly related to S.B.1.  The Attorney General announced his office's formation of an "Election Integrity Unit," which he described as a "concentrated effort to devote agency lawyers, investigators, support staff, and resources to ensuring this local election season . . . is run transparently and securely."[253]  Furthermore, unlike the letter in *TDP*, which simply

---

[249] *Id.*

[250] *Id.* at 181 (quoting *In re Abbott*, 956 F.3d 696, 709 (5th Cir. 2020)).

[251] *Id.*

[252] *City of Austin v. Paxton*, 943 F.3d 993, 1001 (5th Cir. 2019).

[253] ROA.6615-16 (citing *AG Paxton Announces Formation of 2021 Texas Election Integrity Unit*, Office of the Attorney General (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit).

warned of the potential consequences of advising voters to vote by mail without a qualifying disability, the Attorney General's press release explained specific steps he was taking to enforce provisions of the Texas Election Code.  This not only included the creation of an Election Integrity Unit, but also his efforts to hold "many elections administrators . . . accountable for attempts to bend or break the boundaries of lawful practices."[254]  This press release is enough to "intimat[e] that formal enforcement [is] on the horizon."[255]  Accordingly, since the Attorney General has the ability to enforce § 2.06, the press release itself is a sufficient threat of enforcement to constrain or compel the plaintiffs' actions.

**2**

We turn to plaintiffs' challenges to the remaining twenty-eight sections that the district court concluded were not barred by the Attorney General's sovereign immunity.  The district court located the Attorney General's purported authority to enforce these sections in two provisions of Texas law.  First, the district court relied on Texas Election Code § 273.021(a), which states that "[t]he attorney general may prosecute a criminal offense prescribed by the election laws of this state."[256]  Second, the

---

[254] ROA.6616 (citing *AG Paxton Announces Formation of 2021 Texas Election Integrity Unit*, OFFICE OF THE ATTORNEY GENERAL (Oct. 18, 2021), https://www.texasattorneygeneral.gov/news/releases/ag-paxton-announces-formation-2021-texas-election-integrity-unit).

[255] *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 392 (5th Cir. 2015).

[256] *La Unión del Pueblo Entero*, 618 F. Supp. 3d 388, 408-09 (W.D. Tex. 2022); *La Unión del Pueblo Entero*, 618 F. Supp. 3d 449, 479-80 (W.D. Tex. 2022); *La Unión del Pueblo Entero*, 618 F. Supp. 3d 504, 533-34 (W.D. Tex. 2022); ROA.10620, 10682-83, 10752-53.

No. 22-50775
c/w Nos. 22-50777, 22-50778

district court relied on S.B.1 § 8.01, which makes any election official who "violates a provision of this code" "liable to th[e] state for a civil penalty."[257]

Starting with § 273.021, we conclude that *Ostrewich v. Tatum*[258]—a decision our court issued after briefing in this case was submitted—forecloses the district court's determinations.  In *Ostrewich*, we held that the plaintiffs' challenges to certain electioneering laws in suits against the Attorney General were barred by sovereign immunity because § 273.021(a) did not provide the Attorney General with the requisite enforcement authority.[259]  In particular, we concluded that the decision of the Texas Court of Criminal Appeals in *State v. Stephens*[260] was "dispositive."[261]  In *Stephens*, the Texas court held that § 273.021(a) violated Texas's Constitution because the Attorney General has no independent authority to prosecute election-related criminal offenses.[262]  Accordingly, our court recognized that "[t]he Attorney General's power related to elections laws is therefore limited—he does not have the ability to 'compel or constrain local officials' to enforce the electioneering laws, nor can he bring his own proceedings to prosecute election-law violators."[263]

Prior to *Ostrewich*, the plaintiffs argued that *Stephens* did not foreclose their claims.  They offered two arguments for this point: (1) *Stephens* left open

---

[257] *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 408-09; *La Unión del Pueblo Entero*, 618 F. Supp. 3d at 533-34; ROA.10620-21, 10753.

[258] 72 F.4th 94 (5th Cir. 2023).

[259] *Id.* at 101.

[260] 663 S.W.3d 45 (Tex. Crim. App. 2021), *reh'g denied*, 664 S.W.3d 293 (Tex. Crim. App. 2022).

[261] *Ostrewich*, 72 F.4th at 101.

[262] *Stephens*, 663 S.W.3d at 55.

[263] *Ostrewich*, 72 F.4th at 101.

the possibility that the Attorney General could be deputized by a local prosecutor to assist with prosecuting Election Code violations; and (2) the Attorney General still has mandatory and investigative duties.

We addressed these arguments in *Ostrewich*. First, we recognized that the Attorney General could "'prosecute with the permission of the local prosecutor,' but, *critically*, '[he] cannot initiate prosecution unilaterally.'"[264] Second, we noted that"[t]his holds true irrespective of section 273.001," which "empowers the Attorney General to *investigate* criminal conduct upon a triggering event—namely, referral by the Secretary."[265] We found it important that "[n]othing" in § 273.001 "gives the Attorney General the ability to prosecute."[266] Therefore, *Ostrewich* precludes us from concluding that the Attorney General enforces any provision of S.B.1 through § 273.021(a) or its associated investigative powers.

We need not determine whether the Attorney General has the *authority* to enforce any of the provisions of S.B.1 under § 8.01. Whether § 8.01 even provides the Attorney General with the ability to bring a civil suit against an election official for violating a provision of the Texas Election Code is disputed by the parties. The Supreme Court of Texas requires a clear statement that "expressly authoriz[es] the Attorney General . . . to institute and prosecute the statutory suit thus created."[267] The Attorney General argues here that such "a clear statement is not present in" § 8.01. Additionally, the Attorney General argued before the Supreme Court of

---

[264] *Id.* (alteration in original) (emphasis added) (quoting *Stephens*, 663 S.W.3d at 55).

[265] *Id.*

[266] *Id.*

[267] *Smith v. State*, 328 S.W.2d 294, 295 (Tex. 1959) (per curiam).

No. 22-50775
c/w Nos. 22-50777, 22-50778

Texas in *Paxton v. Longoria*[268] that he has no authority to enforce § 8.01.[269] Accordingly, unlike other provisions of S.B.1, the Attorney General, in light of his representations in *Longoria* and in this case, has not demonstrated a willingness to bring any civil action pursuant to § 8.01.[270]

In sum, we reverse the district court's determination that sovereign immunity does not bar the plaintiff's suits against the Attorney General as to the other twenty-eight challenged provisions.

## IV

Finally, we address standing as to the plaintiffs' § 1983 claims that are not otherwise barred by sovereign immunity. "Standing is a question we review *de novo*."[271] The plaintiffs "must establish standing for each and every provision they challenge."[272] But only one plaintiff need establish standing for each claim to satisfy Article III's "case or controversy" requirement.[273] To establish standing,

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as

---

[268] 646 S.W.3d 532 (Tex. 2022).

[269] *Id.* at 541-42 ("[T]he parties now agree that Paxton has no such authority [to enforce § 31.129] with respect to the parties before us.").

[270] *Cf. Mi Familia Vota v. Ogg*, 105 F.4th 313, 331 n.13 (5th Cir. 2024) (noting that if there is willingness to enforce in the future, "the Plaintiffs may be able to amend their complaint to reassert their constitutional claims and overcome sovereign immunity").

[271] *TDP*, 978 F.3d 168, 178 (5th Cir. 2020) (citing *Pederson v. La. State Univ.*, 213 F.3d 858, 869 (5th Cir. 2000)).

[272] *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019).

[273] *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015).

No. 22-50775
c/w Nos. 22-50777, 22-50778

opposed to merely speculative, that the injury will be redressed by a favorable decision.[274]

On a motion to dismiss, the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim."[275]

The only standing argument that the defendants advance, and the only one we address, is that "standing is lacking for the same reason that plaintiffs cannot meet the *Ex parte Young* exception to sovereign immunity: neither the Secretary nor the Attorney General enforces the challenged provisions of S.B. 1."[276] In other words, they argue the plaintiffs' injuries are not traceable to the defendants' actions.

We address only whether plaintiffs' injuries are traceable to the provisions we hold are enforced by the Secretary or the Attorney General.[277] Our decision in *TDP* dictates our conclusion that the traceability and redressability requirements of standing are met for these provisions. In *TDP*, we concluded the plaintiffs, which were "three registered Texas voters" and "the Texas Democratic Party and its Chairman," had standing to challenge the age-requirement for early voting by suing the Secretary based on her authority to prescribe official forms.[278] In reaching this conclusion, we noted that the "Secretary would need to correct the form should the judiciary invalidate the age-based option. Thus, the Secretary of State had a role in

---

[274] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

[275] *Meadowbriar Home for Child., Inc. v. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996) (quoting *Lujan*, 504 U.S. at 561).

[276] *See supra* Part II.B.

[277] S.B.1 §§ 2.05, 2.06, 2.07, 4.12, 5.01, 5.02, 5.03, 5.08, 5.10, 5.13, 6.01, 6.03, 6.05, and 6.07.

[278] *TDP*, 978 F.3d 168, 178 (5th Cir. 2020).

causing the claimed injury and is in a position to redress it at least in part."[279] It was irrelevant that the Secretary did not act directly interact with the voters or the party themselves. We focused on the Secretary's "authority to compel or constrain *local officials* based on actions she takes as to the application form"—not the voters.[280]

Our decision in *OCA-Greater Houston v. Texas*[281] also controls. In that case, OCA's asserted injury was the "'additional time and effort spent explaining the Texas provisions at issue to limited English proficient voters' because 'addressing the challenged provisions frustrate[d] and complicate[d] its routine community outreach activities.'"[282] Texas argued, however, that the injury suffered by OCA was not traceable to the Secretary because county officials were the ones refusing to allow people to assist voters if the assistors were not also registered to vote in that county as required by the challenged statute.[283] We rejected this argument and concluded that "[t]he facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who serves as the 'chief election officer of the state.'"[284]

Here, the plaintiffs point to several alleged harms to their members arising from the Secretary's enforcement of the S.B.1 provisions: exposing the "organization's paid staff and members to investigation and

---

[279] *Id.* at 178.

[280] *Id.* at 180 (emphasis added).

[281] 867 F.3d 604 (5th Cir. 2017).

[282] *Id.* at 611.

[283] *Id.* at 613.

[284] *Id.* at 613-14 (quoting Tex. Elec. Code §§ 31.001(a), 31.003).

No. 22-50775
c/w Nos. 22-50777, 22-50778

prosecution,"[285] and forcing the organizations "to divert its resources away from its [get out the vote], voter registration and community education activities . . . to counteract the negative effects of SB1 on its members."[286] The Secretary "ha[s] a role in causing the claimed injur[ies]" through her duty to sanction voter registrars who fail to comply with the rules and provisions on updating voter registration lists, and by creating the mail-in ballot applications and voter-assistance forms.[287] Accordingly, she "is in a position to redress it at least in part" and "that is enough to confer standing to the [] plaintiffs to sue the Secretary."[288]

As discussed above, the Attorney General enforces § 2.06, and injuries alleged by plaintiffs are traceable to his actions. The plaintiffs have satisfied the traceability and redressability requirements to challenge the provisions we have concluded are enforced by the Secretary or by the Attorney General.

\* \* \*

For the aforementioned reasons, we AFFIRM the district court's denial of the Secretary's motion to dismiss plaintiffs' § 1983 claims

---

[285] ROA.6647; *see also* ROA.6208 ("Plaintiff Mi Familia Vota will be forced to divert resources to assist voters with these changes and will spend significant time educating voters on these new rules and on trying to support voters who may or may not receive notice of alleged defects."); ROA.6313-14 ("OCA-GH will have to spend money to create new training materials for volunteers, independent contractors, and employees . . . .").

[286] ROA.6649 (LUPE complaint); *see also* ROA.6208 ("Plaintiff Mi Familia Vota will be forced to divert resources to assist voters with these changes and will spend significant time educating voters on these new rules and on trying to support voters who may or may not receive notice of alleged defects.").

[287] *TDP*, 978 F.3d at 178.

[288] *Id.*

No. 22-50775
c/w Nos. 22-50777, 22-50778

challenging S.B.1 §§ 2.05, 2.06, 2.07, 4.12, 5.01, 5.02, 5.03, 5.08, 5.10, 5.13, 6.01, 6.03, 6.05, and 6.07.  We REVERSE the district court's denial of the Secretary's motion to dismiss plaintiffs' § 1983 claims challenging §§ 2.04, 2.08, 3.04, 3.09, 3.10, 3.12, 3.13, 3.15, 4.01, 4.06, 4.07, 4.09, 5.04, 5.06, 5.07, 5.11, 5.12, 5.14, 6.04, 6.06, 7.02, 7.04, and 8.01.  We REVERSE the district court's denial of the Attorney General's motion to dismiss plaintiffs' § 1983 challenges with respect to all challenged provisions other than § 2.06.

No. 22-50775
c/w Nos. 22-50777, 22-50778

Andrew S. Oldham, *Circuit Judge*, concurring in part and dissenting in part:

I agree that we have collateral-order jurisdiction over this appeal. But I respectfully disagree that any part of this suit can proceed in district court. The Texas Secretary of State and the Texas Attorney General are not connected in any way to the enforcement of S.B.1 against these plaintiffs. Therefore, the *Ex parte Young* exception to the State's sovereign immunity does not apply, and the entire suit should be dismissed.

I

I've previously expressed my concerns with the *Ex parte Young* doctrine. *See* Hon. Andrew S. Oldham, Adam I. Steene, & John W. Tienken, *The* Ex parte Young *Cause of Action: A Riddle, Wrapped in a Mystery, Inside an Enigma*, 120 Nw. L. Rev. ___ (forthcoming 2026), https://perma.cc/3RPZ-CFTM. In *Ex parte Young*, the Supreme Court announced a "nonstatutory equitable cause of action" for injunctive relief against state officers that is "at odds with the Founding-era understanding of federal equitable power." *Id.* at 1, 16. The Court did so notwithstanding the state officers' entitlement to sovereign immunity. *Ex parte Young*, 209 U.S. 123, 156–60 (1908). And we continue to apply *Ex parte Young* in ways that that create all sorts of problems. *See Green Valley Special Utility Dist. v. City of Schertz*, 969 F.3d 460, 494–502 (5th Cir. 2020) (en banc) (Oldham, J., concurring) (asking how to square *Ex parte Young* with modern views of federal-courts doctrines and statutes such as 42 U.S.C. § 1983 and the Declaratory Judgment Act).

While *Ex parte Young* itself is bad, our circuit's application of *Ex parte Young* is indefensible. In our circuit, so long as the defendant has some connection—virtually any connection—to the enforcement of a state law against *someone*, then *anyone* can get an injunction against enforcement of the

law. It does not matter that the defendant cannot enforce the law *against the plaintiff*. That is, we require *zero* connection between the defendant and the plaintiff. I call this the No Nexus Rule. And the No Nexus Rule is deeply problematic. It eliminates the entire basis for *Ex parte Young* in the first place. And it allows plaintiffs to sue the state law as a mythical "defendant" and ask federal courts to "strike down" laws in contravention of Article III's limits.

In this part, I (A) explain the relevant portion of *Ex parte Young*. Then I (B) explain how our court misapplied that precedent to adopt the No Nexus Rule.

## A

Let's start with *Ex parte Young*. Love it or hate it, that decision is a cornerstone of modern federal court practice. It has two main holdings—one that implies an equitable cause of action and another that announces an exception to state sovereign immunity. *See* Oldham et al., *supra*, at 3; John Harrison, Ex parte Young, 60 Stan. L. Rev. 989, 990–91 (2008). Only the second merits discussion here.

How does the *Ex parte Young* exception to state sovereign immunity work? States and their officers generally enjoy sovereign immunity from suit. That "immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today." *Alden v. Maine*, 527 U.S. 706, 713 (1999). It is a "historically rooted principle embedded in the text and structure of the Constitution." *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 248 (2019); *see also id.* at 237–44 (recounting this history).

*Ex parte Young* created a narrow exception to States' sovereign immunity: When a state officer threatens to enforce state law in a way that violates a plaintiff's rights under the federal Constitution, *Ex parte Young* says the officer is not acting as "the State." 209 U.S. at 159–60. How so? State

No. 22-50775
c/w Nos. 22-50777, 22-50778

officers obviously are bound by the federal Constitution. *See* U.S. Const. art. VI, cl. 2. So if the state officer is enforcing state law in a way that violates the plaintiff's federal constitutional rights, the state officer is in effect acting *ultra vires*. *Ex parte Young*, 209 U.S. at 159–60. He is stepping outside the confines of "the State"—and hence he does not enjoy the State's sovereign immunity against an injunction that protects the plaintiff's federal constitutional rights.

This mode of analysis is analogous to the one that motivated *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). In *Marbury*, the plaintiff invoked his statutory right to a writ of mandamus under § 13 of the Judiciary Act of 1789. *See id.* at 153–55. But that statutory right was trumped by Article III's constitutional limits on federal courts. The Supreme Court in *Marbury* emphatically did not announce some freestanding power to use judicial review to invalidate statutes. Rather, it said that to resolve the plaintiff's case, the court must prioritize the "superior" law (the Constitution) over the inferior one (a statute). *Id.* at 177–79.

So too in *Ex parte Young*. The *Ex parte Young* Court emphatically did not announce some freestanding federal judicial power to enjoin state laws. Rather, it announced a narrow exception to state sovereign immunity—only insofar as "necessary to permit the courts to vindicate *[the plaintiff's] federal rights*." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (emphasis added). That is, when the state official is threatening to violate the plaintiff's federal rights, the court must prioritize the superior law (federal) over the inferior one (state sovereign immunity). Therefore, it is critical to the entire *Ex parte Young* doctrine that the defendant state official is threatening to enforce an unconstitutional state law *against the plaintiff*.

Take the facts of *Ex parte Young*. In that case, railroad shareholders sued the Attorney General of Minnesota, Edward T. Young, in federal court.

No. 22-50775
c/w Nos. 22-50777, 22-50778

The shareholders argued that General Young was threatening to enforce a state railroad-regulation law that violated the shareholders' federal rights under then-prevailing understandings of "substantive" due process. *Ex parte Young*, 209 U.S. at 144. The federal court agreed that the shareholders' federal rights were imperiled, so it enjoined General Young from enforcing the state law against the plaintiffs' railroads. *See id.* at 144–64; *Perkins v. N. Pac. Ry. Co.*, 155 F. 445 (C.C.D. Minn. 1907). The Supreme Court ultimately agreed that the injunction was valid. *See* Oldham et al., *supra*, at 3. But it was essential to that outcome that the federal court enjoined General Young from enforcing the state law *against the plaintiffs*.

## B

Fifth Circuit precedent, however, does no such thing. It requires absolutely *no nexus* between the defendant and the plaintiff. I explain both (1) this circuit's No Nexus Rule and (2) some of its problems.

## 1

When a plaintiff requests an injunction against a state official, the Fifth Circuit asks whether the official possesses some minimum amount of enforcement power over the challenged state law. *See, e.g.*, *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020) ("[T]he official must have the requisite connection to the enforcement of the particular statutory provision that is the subject of the litigation."). If the defendant can enforce the state law against *anyone*, then he loses his state sovereign immunity against *everyone*. *See ibid.*

It is true of course that *Ex parte Young* said the defendant "officer must have *some connection* with the enforcement of the" allegedly unconstitutional state law. 209 U.S. at 157 (emphasis added). But the "some connection" is between (A) the defendant's enforcement of state law and (B) *the plaintiff's rights* under federal law. *Ex parte Young* made this clear on

No. 22-50775
c/w Nos. 22-50777, 22-50778

the very next page of the Court's opinion, which said a proper defendant is a state officer "who commit[s], under [the state law's] authority, *some specific wrong or trespass, to the injury of plaintiff's [federal] rights.*" *Id.* at 158 (emphasis added).

For reasons that I cannot understand or identify in our court's precedents, the Fifth Circuit has wrenched "some connection" from the pages of *Ex parte Young*, blindly applied the phrase, and completely lost the script in the process. In our court, the requisite "some connection" is between (A) the defendant officer and (B) the challenged state law. And under our No Nexus Rule, there is *zero* required connection between the defendant's enforcement of state law *and the plaintiff.*

2

This has led to wildly inconsistent circuit precedent—and theoretically bankrupt articulations of the "some connection" standard. For example, we have asked whether an official has "more than a general duty to see that" the law is implemented, has "demonstrated willingness to exercise that duty," or has authority to "compel or constrain" individuals in some way to obey the law. *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024) (quotations omitted). Beyond requiring at least "some scintilla" of responsibility to enforce the challenged statute, of course, it is "not clear from our jurisprudence" what level of connection is "sufficient" for an official to be subject to suit. *City of Austin v. Paxton*, 943 F.3d 993, 999–1003 (5th Cir. 2019) (quotation omitted) (summarizing intra-circuit split on how to apply the "connection" test); *see also Tex. Democratic Party v. Hughs*, 860 F. App'x 874, 877 (5th Cir. 2021) (our "binding precedents" in this area "do not provide as much clarity as we would prefer"); *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) ("*TARA*") ("How much of a

No. 22-50775
c/w Nos. 22-50777, 22-50778

'connection' has been hard to pin down."); *ante*, at 22 ("The required 'connection,' . . . can be difficult to articulate.").

Of course, none of this has anything at all to do with *Ex parte Young* because none of it focuses on the thing that mattered in *Ex parte Young* itself—namely, the connection between the defendant's enforcement of state law and the plaintiff's federal rights. Rather, our precedent asks the wrong question ("Does this defendant enforce state law against *anyone*?") and then generates deeply wrong answers ("If yes, any plaintiff can sue for anything."). Once we have the "proper defendant," we entertain facial and as-applied challenges to the challenged provisions, sometimes not even requiring plaintiffs to clearly distinguish between them. *See, e.g.*, *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 405 (5th Cir. 2025) (entertaining First Amendment facial challenge); *Tex. Democratic Party*, 978 F.3d at 182 (allowing a suit challenging Texas's absentee-voting law to proceed "[r]egardless of whether the plaintiffs are presenting on this appeal a facial or as-applied challenge" (quotation omitted)). And we say plaintiffs can ask for global injunctions against state laws that cannot possibly *ever* be enforced against the plaintiffs themselves. *See, e.g.*, *TARA*, 28 F.4th at 673 (quotation omitted) (asking whether the Secretary of State "compel[s] or constrain[s] local officials to print ballots" even though plaintiffs were not local officials); *United States v. Texas*, 144 F.4th 632, 712–19 (5th Cir. 2025) (OLDHAM, J., dissenting), *vacated*, 150 F.4th 656 (5th Cir. 2025) (per curiam).

In addition to offending *Ex parte Young* itself, our No Nexus Rule is tantamount to a writ of erasure: The federal court is entertaining a suit against the purportedly unconstitutional statute itself.

Federal courts cannot "strike down" statutes as unconstitutional. *See generally* Jonathan F. Mitchell, *The Writ of Erasure Fallacy*, 104 VA. L. REV.

933 (2018). Doing so is inconsistent with limits on our equitable powers and the power of judicial review. *See ibid.*

But that is exactly what happens when a federal court prohibits the enforcement of a statute without regard to whether the defendant official enforces anything against the plaintiff. We end up treating *Ex parte Young* as granting us a "license to strike," so long as we can find any defendant that's involved enough in the statutory scheme that our injunction would force state officials to cease enforcing the challenged provisions. Unless we identify what the state official has done *to the plaintiff* to create the case or controversy before us, we are not simply enjoining the state official from violating the plaintiff's federal rights. We are assuming an unfounded power to invalidate the state law itself, without regard to the fact that the defendant officer cannot enforce it against the plaintiff before us.

\*

In sum, when a plaintiff sues under *Ex parte Young*, the defendant must have a "connection to enforcement" *against the plaintiff*. Federal courts are entitled to ignore a state official's sovereign immunity only if there is an enforcement nexus between the defendant's enforcement authority under the challenged statute and the plaintiff. But our precedent ignores these principles and instead embraces the No Nexus Rule. We don't require the plaintiff to identify whether the state official has "some connection to enforcement" against the plaintiff. We simply identify an official who enforces an allegedly unconstitutional provision and call it a day. That is inconsistent with *Ex parte Young* itself. And it arrogates to federal courts an illegitimate erasure power.

## II

The majority allows the plaintiffs to challenge three categories of provisions in Texas's S.B.1. Some of those challenges run against (A) the

No. 22-50775
c/w Nos. 22-50777, 22-50778

Secretary of State of Texas. Others run against (B) the Attorney General of Texas. But *none* of the challenged provisions can be enforced by either officer against the plaintiffs. And therefore none of them belong in federal court.

## A

Let's start with the Secretary of State. The majority says state sovereign immunity does not bar the plaintiffs from suing the Secretary of State for three categories of provisions. The Secretary enforces none of these against the plaintiffs.

*First*, the voter registration list provisions. Sections 2.05, 2.06, and 2.07 "operationalize the Secretary's duty to sanction voter registrars who fail to comply with the rules and provisions on updating voter registration lists." *Ante*, at 23–24. Section 2.05 directs the Secretary to establish a system for comparing the information in the statewide voter registration list and the Department of Public Safety's ("DPS") database each month to verify voters' citizenship status. S.B.1 § 2.05 (codified at TEX. ELEC. CODE § 16.0332(a-1)). Section 2.07 instructs the Secretary to compare these lists each quarter, identify voters who no longer reside in counties in which they are registered to vote, and notify the county voter registrars of that fact. *Id.* § 2.07 (codified at TEX. ELEC. CODE § 18.068(a)). Once the registrars receive that notice, they must instruct the voters to "submit to the registrar proof of United States citizenship." *Id.* § 2.05 (codified at TEX. ELEC. CODE § 16.0332(a)). Section 2.06 requires the Secretary to sanction voter registrars who are "not in substantial compliance" with the statute and regulations for updating voter registration lists. *Id.* § 2.06 (codified at TEX. ELEC. CODE § 18.065(e)–(i)). Possible sanctions include mandatory training courses, audits on counties' voter registration lists, and civil penalties payable to the State. *Ibid.* The majority concludes that these duties

No. 22-50775
c/w Nos. 22-50777, 22-50778

are a sufficient "connection" to enforcement that the plaintiffs may sue the Secretary. *Ante*, at 23–27.

What does any of this have to do with the plaintiffs? Literally nothing because the plaintiffs are not registrars. The LUPE and MFV plaintiffs purport to represent the interests of *voters*. The LUPE and MFV plaintiffs allege that the provisions requiring regular "purges of the voter rolls" violate the First and Fourteenth Amendments because they "burden naturalized and lawfully registered individuals" in exercising their right to vote, especially by requiring them to "provide costly proof of citizenship or be subject to presumptive voter registration cancellation." MFV Br. at 5; *see also* ROA.6664–69 (LUPE Plaintiffs' Second Amended Complaint) (alleging the provisions create "cumulative" burdens that "abridge the opportunity of minority voters to participate in the political process" by voting). The problem is that the Secretary of State does not enforce anything against the voters the plaintiffs purport to represent. The county registrars might—but the plaintiffs did not sue the county registrars. And county officials are not entitled to state sovereign immunity in any event. *See Lincoln County v. Luning*, 133 U.S. 529, 530 (1890).

A quick comparison of the duties of the voter registrars and the Secretary in this voter registration scheme shows that the Secretary does not have an enforcement nexus *to the plaintiffs* under the statute. Voter registrars prepare certified lists of registered voters and update and correct those lists. *See, e.g.*, Tex. Elec. Code §§ 18.001 ("the registrar shall prepare . . . a certified list of the registered voters in the precinct"), 18.003 ("the registrar shall prepare and furnish . . . a certified list of corrections"). Voter registrars supply the Secretary with "the information necessary to maintain" the new statewide registration list, *id.* § 18.061(c), including information about which voters are on a "suspense list" because they no longer reside in a county, *id.* §§ 15.081(a)(3), 15.083. And even when the Secretary notifies voter

No. 22-50775
c/w Nos. 22-50777, 22-50778

registrars that a voter lacks a DPS record proving his or her citizenship in the county, the registrars are the ones who are statutorily required to reach out to the voter to provide proof of citizenship and to cancel the individual's voter registration if he or she can't meet those requirements. *Id.* § 16.0332(a)–(b). Only the registrars can inflict constitutional injuries on the plaintiffs by forcing them to either "provide costly proof of citizenship" or cancel their voter registrations. MFV Br. at 5.[1]

The majority nonetheless concludes the Secretary is the proper defendant because she is "specially charge[d] . . . with the duty to enforce" the challenged provisions. *Ante*, at 24–25. (quotation omitted). This simply highlights and expands the error in our No Nexus Rule. Sure, the Secretary must notify registrars that individual voters should be investigated, S.B.1 § 2.07 (codified at Tex. Elec. Code § 18.068(a)), and can sanction the county registrars who don't substantially comply with their duties under the statute, *id.* § 2.06 (codified at Tex. Elec. Code § 18.065(e)–(i)). Those duties give the Secretary some level of "compulsion or constraint." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). But that ability to compel or constrain is wielded *against the county registrars*, not the plaintiffs. The majority calls the Secretary's notifying and sanctioning authority a "direct" connection to "purging voter registration rolls." *Ante*, at 25. But it's attenuated at best—the Secretary can't force the registrars to exercise their

---

[1] Some plaintiffs' members serve as poll workers and volunteer deputy registrars. *See, e.g.*, ROA.6605–06 (LUPE Second Amended Complaint) (listing organizations whose members "serve as poll workers and volunteer deputy registrars"). But the Secretary does not have the authority to sanction volunteer deputy registrars under these provisions because volunteer deputy registrars have no statutory authority to update voter registration lists. Volunteer deputy registrars "cannot determine if the applicant is actually qualified to register to vote." Elections Div., Tex. Sec. of State, Texas Volunteer Deputy Registrar Guide 4 (revised Oct. 3, 2025), https://perma.cc/3G7K-JFZ6 (quotation modified). Only county voter registrars can. *See supra* at 64.

No. 22-50775
c/w Nos. 22-50777, 22-50778

power to remove any particular voter from the registration list. Even if she recommends voters for investigation, she can only sanction registrars who are out of "substantial" compliance with their overall duties. It doesn't matter that state law doesn't "permit[] a registrar to ignore a notice that a person is a noncitizen or no longer a resident of the county in which they are registered to vote." *Ante*, at 26. The registrar is still the one burdening the voter's rights. *The Secretary* has no direct enforcement authority against the plaintiffs' members.

*Second*, the provisions regulating early voting and mail-in ballot application forms. Sections 5.01, 5.02, 5.03, and 5.08 require the early voting and mail-in ballot application forms and carrier envelopes to contain new information to verify voters' identities. *See, e.g.*, S.B.1 §§ 5.01 (codified at Tex. Elec. Code § 84.001(b)) (requiring a wet signature on mail-in ballot applications), 5.02 (codified at Tex. Elec. Code § 84.002(1-a)) (requiring voters to include government ID information on early voting ballot applications); 5.03 (codified at Tex. Elec. Code § 84.011(a)) (requiring official early voting application forms to contain spaces for entering government ID information); 5.08 (codified at Tex. Elec. Code § 86.002) (requiring carrier envelopes to include spaces for the same). Section 5.13 confirms that ballots may not be accepted unless the ballot satisfies these requirements. *Id.* § 5.13 (codified at Tex. Elec. Code § 87.041). Plaintiffs object that that these "byzantine identification requirements for voting by mail" burden their members' right to vote, MFV Br. at 7, LUPE Br. at 6–7, 10, by "increas[ing] rejections, especially among voters with disabilities and voters who speak languages other than English," OCA-Greater Houston Br. at 3.

The Secretary's role in this scheme is miniscule at best. She is tasked with "prescribing the design and content of" the forms, Tex. Br. at 35 (quotation omitted), and must "provide an online tool" to "allow a voter to

add or correct" the newly required information, S.B.1 § 5.10 (codified at Tex. Elec. Code § 86.015). But these duties have absolutely nothing to do with the plaintiffs' constitutional arguments. Plaintiffs complain that the cost of *presenting certain identification information to local voting officials* burdens their right to vote, not that the Secretary's choice in how to design the forms with that information burdens their rights. The Secretary's regulatory role does nothing to harm these plaintiffs.

Local election officials are the ones statutorily required to subject plaintiffs to the new ballot and application requirements, not the Secretary. The "early voting clerk[s]" "review each application for a ballot to be voted by mail," "reject" applications that do not contain a wet signature or the appropriate government identification, and notify voters about how to correct the defects. Tex. Elec. Code § 86.001. Local signature verification committees and early voting ballot boards review early and mail-in ballots and carrier envelopes for defects and, if possible, offer the opportunity to correct those defects. S.B.1 §§ 5.11–.14 (codified at Tex. Elec. Code §§ 87.027–.0271, 87.041–.0411); *see Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022) ("It is local election officials, not the Secretary, who verify voters' signatures and notify voters of a mismatch."). And if a voter's application gets tossed, local election judges may permit a voter to cast a provisional ballot. S.B.1 § 5.06 (codified at Tex. Elec. Code § 84.035). None of these duties are held by the Secretary, so the purportedly unconstitutional burdens on plaintiffs' members are coming from different state officials. And granting an injunction against the Secretary "would not afford the [p]laintiffs the relief that they seek." *See Richardson v. Flores*, 28 F.4th 649, 654 (5th Cir. 2022) (quotation omitted). If we granted an injunction here, we would "not relieve . . . local officials of their obligation" to reject applications that do not comply with the new requirements. Tex. Br. at 37–38, 41–42; *see* S.B.1 § 5.13.

No. 22-50775
c/w Nos. 22-50777, 22-50778

*Third*, the provisions regulating the voter-assistance and ballot-delivery forms. Section 4.12 requires that if a voter delivers her early voting ballot in person, the receiving local election official must document the voter's name, signature, and government identification on a prescribed roster. S.B.1. § 4.12 (codified at Tex. Elec. Code § 86.006). Sections 6.01, 6.03, 6.05, and 6.07 impose new requirements on individuals assisting voters in casting ballots. If an assistor transports seven or more voters to a polling place, she must fill out and sign a form that documents her name and address. *Id.* § 6.01 (codified at Tex. Elec. Code § 64.009). Sections 6.05 and 6.07 require an assistor to include her name, address, relationship to the voter, and whether she received compensation in exchange for providing assistance on the carrier envelope for mail-in ballots. *Id.* §§ 6.05 (codified at Tex. Elec. Code § 86.010) (the substantive requirement), 6.07 (codified at Tex. Elec. Code § 86.013) (the requirement to design the carrier envelopes to include space to write such information). Plaintiffs argue that these provisions "significantly increase[] the burden for those who assist voters and den[y] voters who need assistance access to their chosen assistor" by requiring voter assistors to provide personal background information and to foreclose "compensation" for mail-in voting support. *See, e.g.*, MFV Br at 7–8; OCA-Greater Houston Br. at 3.

The exact same problems with the early voting and mail-in voting provisions infect the majority's *Ex parte Young* analysis here. The Secretary's only role is regulatory—to "prescribe[]" the forms and carrier envelopes for voters, transporters, and voting assistors to fill out. *See* S.B.1 §§ 4.12 (codified at Tex. Elec. Code § 86.006) (receiving official must record voter's name "on a roster prescribed by" the Secretary), 6.01 (codified at Tex. Elec. Code § 64.009) (requiring the Secretary to prescribe forms for persons transporting voters); Tex. Elec. Code § 86.013 (similar for carrier envelopes). Only local "election officer[s]" can turn voters,

No. 22-50775
c/w Nos. 22-50777, 22-50778

transporters, or ballot assistors away if they refuse to comply. *See* S.B.1 §§ 4.12, 6.01, 6.03. Nothing in S.B.1 deputizes the Secretary to "compel or constrain" the plaintiffs "to obey" these provisions. *TARA*, 28 F.4th at 672. The Secretary is doing *nothing* to enforce the challenged provisions against the plaintiffs.

\*

In sum, the Secretary of State does not enforce these provisions against the plaintiffs. Therefore, even if someone is violating the plaintiffs' federal rights, it is not the Secretary. And that means the *Ex parte Young* exception to the Secretary's state sovereign immunity cannot apply.

B

The majority concludes that the Attorney General is a proper *Ex parte Young* defendant with respect to § 2.06 because it authorizes him to sue counties to impose a civil penalty if the county voter registrars don't substantially comply with their duties under S.B.1. *See ante*, at 45–49; S.B.1 § 2.06 (codified at Tex. Elec. Code § 18.065). Again, that is wrong because the Attorney General can enforce the law against counties—not the plaintiffs.

True, the Attorney General has "some connection" to the enforcement of § 2.06. And the Attorney General has demonstrated his willingness to enforce § 2.06 by releasing a public statement that he has formed an "Election Integrity" team to enforce provisions of the Texas Election Code. *See* LUPE Br. at 45; ROA.6615–16 (citing Off. of Att'y Gen., *AG Paxton Announces Formation of 2021 Texas Election Integrity Unit* (Oct. 18, 2021), https://perma.cc/JM4H-9ZWL); *see also* ROA.10628 (alleging that the Attorney General had, as of the district court's order, brought "510 election offenses against 43 defendants" and had "386 active election fraud investigations" active).

No. 22-50775
c/w Nos. 22-50777, 22-50778

But the Attorney General has *zero* connection to the plaintiffs. He has zero ability to remove voters from the registration lists. He has zero authority to throw out applications or ballots. And even if we were to enjoin the Attorney General from initiating civil prosecutions against noncompliant counties, that doesn't remove the obligation of voter registrars to reject noncompliant applications, require voters to sign prescribed forms and provide identifying information, or otherwise lift the burdens the plaintiffs allege are unconstitutional. In short, because the Attorney General does nothing to enforce § 2.06 against the plaintiffs, an injunction against his enforcement of that statute does nothing to protect plaintiffs' federal rights.

\*

*Ex parte Young* requires a connection between (A) the defendant's enforcement of state law and (B) the plaintiff's federal rights. This circuit, however, has adopted a No Nexus Rule: We require zero connection between the defendant's enforcement and the plaintiff. That creates a host of anomalies, as this case illustrates: It allows plaintiffs to get facial relief against state statutes that *are not now* and *cannot ever* be enforced against them by the defendants. And meanwhile, our precedent is beset by entropy: Each new panel focuses on whether the defendant has more than a scintilla of enforcement authority over the challenged state law, which generates ever-more-chaotic-and-inconsistent decisions about how much enforcement authority is enough. All while completely ignoring the only nexus that matters—the connection between the defendant *and the plaintiff's federal rights*.

There is no such connection here. This case should be dismissed. I respectfully dissent in part.